(No. 86830.—

.SHEILA JONES, Individually and as Mother and Next Friend of Shawndale Jones, a Minor, Appellant, v. CHICAGO HMO LTD. OF ILLINOIS, Appellee.

*Opinion filed May 18, 2000.*

MILLER and RATHJE, JJ., concurring in part and dissenting in part.

A. Denison Weaver and Maureen Martin, of Chicago, for appellant.

Baker & McKenzie, of Chicago (Michael A. Pollard, Mark L. Karasik and Patricia O'Brien, of counsel), and Hinshaw & Culbertson, of Chicago (Joshua G. Vincent, of counsel), for appellee.

John L. Nisivaco, of Terrence J. Lavin & Associates, of Chicago, for *amicus curiae* Illinois Trial Lawyers Association.

Herbolsheimer, Lannon, Henson, Duncan & Reagan, P.C., of Ottawa (Michael T. Reagan, of counsel), for *amicus curiae* Illinois Association of Health Maintenance Organizations.

JUSTICE BILANDIC delivered the opinion of the court:

This appeal asks whether a health maintenance organization (HMO) may be held liable for institutional negligence. We answer in the affirmative.

The plaintiff, Sheila Jones (Jones), individually and as the mother of the minor, Shawndale Jones, brought this medical malpractice action against the defendants, Chicago HMO Ltd. of Illinois (Chicago HMO), Dr. Robert A. Jordan and another party. The Joneses were members of Chicago HMO, an HMO. Dr. Jordan was a contract physician of Chicago HMO and the primary care physician of Shawndale.

The circuit court of Cook County awarded summary judgment in favor of Chicago HMO on all three counts of Jones' second amended complaint. Count I charges

Chicago HMO with institutional negligence. Count II charges Chicago HMO with vicarious liability for Dr. Jordan's alleged negligence under the doctrine of apparent authority. Count III charges Chicago HMO with breach of contract. The circuit court also entered a finding pursuant to Supreme Court Rule 304(a) (155 Ill. 2d R. 304(a)). On appeal, the appellate court affirmed the grant of summary judgment as to counts I and III, but reversed the grant of summary judgment as to count II, remanding that claim for further proceedings. 301 Ill. App. 3d 103. We allowed Jones' petition for leave to appeal (177 Ill. 2d R. 315). Because Chicago HMO does not challenge the appellate court's reversal of count II, only counts I and III are at issue in this appeal.

Two organizations filed *amicus curiae* briefs with the permission of this court. See 155 Ill. 2d R. 345. The Illinois Association of Health Maintenance Organizations filed a brief in support of Chicago HMO. The Illinois Trial Lawyers Association filed a brief in support of Jones. For the reasons explained below, we affirm the summary judgment as to count III, breach of contract, but we reverse the summary judgment as to count I, institutional negligence, and remand that claim for further proceedings.

## FACTS

In reviewing an award of summary judgment, we must view the facts in the light most favorable to the nonmoving party. *Petrovich v. Share Health Plan of Illinois, Inc.*, 188 Ill. 2d 17, 30-31 (1999). The following facts thus emerge.

On January 18, 1991, Jones' three-month-old daughter Shawndale was ill. Jones called Dr. Jordan's office, as she had been instructed to do by Chicago HMO. Jones related Shawndale's symptoms, specifically that she was sick, was constipated, was crying a lot and felt very warm. An assistant advised Jones to give Shawndale

some castor oil. When Jones insisted on speaking with Dr. Jordan, the assistant stated that Dr. Jordan was not available but would return her call. Dr. Jordan returned Jones' call late that evening. After Jones described the same symptoms to Dr. Jordan, he also advised Jones to give castor oil to Shawndale.

On January 19, 1991, Jones took Shawndale to a hospital emergency room because her condition had not improved. Chicago HMO authorized Shawndale's admission. Shawndale was diagnosed with bacterial meningitis, secondary to bilateral otitis media, an ear infection. As a result of the meningitis, Shawndale is permanently disabled.

The medical expert for the plaintiff, Dr. Richard Pawl, stated in his affidavit and deposition testimony that Dr. Jordan had deviated from the standard of care. In Dr. Pawl's opinion, upon being advised of a three-month-old infant who is warm, irritable and constipated, the standard of care requires a physician to schedule an immediate appointment to see the infant or, alternatively, to instruct the parent to obtain immediate medical care for the infant through another physician. Dr. Pawl gave no opinion regarding whether Chicago HMO was negligent.

Although Jones filed this action against Chicago HMO, Dr. Jordan and another party, this appeal concerns only counts I and III of Jones' second amended complaint, which are directed against Chicago HMO. Count I charges Chicago HMO with institutional negligence for, *inter alia*, (1) negligently assigning Dr. Jordan as Shawndale's primary care physician while he was serving an overloaded patient population, and (2) negligently adopting procedures that required Jones to call first for an appointment before visiting the doctor's office or obtaining emergency care. Count III charges Chicago HMO with breach of contract and is based solely on Chicago HMO's contract with the Department of Public Aid. Chicago

HMO moved for summary judgment on both counts. Jones and Chicago HMO submitted various depositions, affidavits and exhibits in support of their positions.

Chicago HMO is a for-profit corporation. During all pertinent times, Chicago HMO was organized as an independent practice association model HMO under the Illinois Health Maintenance Organization Act (Ill. Rev. Stat. 1991, ch. 111½, par. 1401 *et seq.*).

In her deposition testimony, Jones described how she first enrolled in Chicago HMO while living in Park Forest. A Chicago HMO representative visited her home. According to Jones, he "was telling me what it was all about, that HMO is better than a regular medical card and everything so I am just listening to him and signing my name and stuff on the papers. *** I asked him what kind of benefits you get out of it and stuff, and he was telling me that it is better than a regular card."

The "HMO ENROLLMENT UNDERSTANDING" form signed by Jones in 1987 stated: "I understand that all my medical care will be provided through the Health Plan once my application becomes effective." Jones remembered that, at the time she signed this form, the Chicago HMO representative told her "you have got to call your doctor and stuff before you see your doctor; and before you go to the hospital, you have got to call."

Jones testified that when she later moved to Chicago Heights another Chicago HMO representative visited her home. This meeting was not arranged in advance. It occurred because the representative was "in the building knocking from door to door." Jones informed the representative that she was already a member.

When Jones moved to Chicago Heights, she did not select Dr. Jordan as Shawndale's primary care physician. Rather, Chicago HMO assigned Dr. Jordan to her. Jones explained:

"They gave me *** Dr. Jordan. They didn't ask me if I

wanted a doctor. They gave me him.

*  *  *

*** They told me that he was a good doctor *** for the kids because I didn't know what doctor to take my kids to because I was staying in Chicago Heights so they gave me him so I started taking my kids there to him."

Dr. Mitchell J. Trubitt, Chicago HMO's medical director, testified at his deposition that Dr. Jordan was under contract with Chicago HMO for two sites, Homewood and Chicago Heights. The service agreement for the Homewood site was first entered into on May 5, 1987. The service agreement for the Chicago Heights site was first entered into on February 1, 1990. Dr. Jordan was serving both patient populations in January of 1991 when Shawndale became ill.

Dr. Trubitt stated that, before Chicago HMO and Dr. Jordan executed the Chicago Heights service agreement, another physician serviced that area. Chicago HMO terminated that physician for failing to provide covered immunizations. At the time that Chicago HMO terminated that physician, Dr. Jordan agreed "to go into the [Chicago Heights] area and serve the patients." Chicago HMO then assigned to Dr. Jordan all of the patients of that physician. Dr. Trubitt explained:

"Q. So then with the elimination of [the other physician], Dr. Jordan then—were the members notified that Dr. Jordan would be their [primary care physician] from that point on?

A. Yes.

Q. They weren't given a choice?

A. At that point in the area there was no choice.

Q. So they weren't given a choice?

A. They were directed to Dr. Jordan."

Dr. Trubitt also explained that Dr. Jordan was Chicago HMO's only physician who was willing to serve the public aid membership in Chicago Heights. Dr. Trubitt characterized this lack of physicians as "a problem" for Chicago HMO.

Dr. Jordan testified at his deposition that, in January of 1991, he was a solo practitioner. He divided his time equally between his offices in Homewood and Chicago Heights. Dr. Jordan was under contract with Chicago HMO for both sites. In addition, Dr. Jordan was under contract with 20 other HMOs, and he maintained his own private practice of non-HMO patients. Dr. Jordan estimated that he was designated the primary care physician of 3,000 Chicago HMO members and 1,500 members of other HMOs. In contrast to Dr. Jordan's estimate, Chicago HMO's own "Provider Capitation Summary Reports" listed Dr. Jordan as being the primary care provider of 4,527 Chicago HMO patients as of December 1, 1990.

Jones' legal counsel and Dr. Trubitt engaged in the following colloquy concerning patient load:

"Q. In entering into an agreement with a provider, is any consideration given to the number of patients to be designated as the primary provider for?

A. Yes, there is consideration given to that element in terms of volume of patients that he is capable of handling.

Q. And who determines the volume of patients he is capable of handling? The Chicago HMO or the provider or–

A. There is some guidelines that HCFA provides.

Q. Who provides?

A. HCFA. The Health [Care Finance Administration], the governmental health and welfare.

Q. Do you happen to know what those limits are with respect to pediatricians?

A. I am going to say I believe they are 3,500 patients to a primary care physician. The number can be expanded depending on the number of physicians in the office and the number of hours of operation.

Q. So you can't tell me whether or not if Dr. Jordan had 6,000 or 6,500 that would be an unusually large number?

A. If he himself had it.

Q. It would be unusually large?

A. It would.

Q. And that would be of some concern to the Chicago HMO, right?

A. Well, yes, if he had those."

In January of 1991, Dr. Jordan employed four part-time physicians, in addition to himself. This included an obstetrician/gynecologist, an internist, a family practitioner and a pediatrician. Dr. Jordan, however, did not explain in what capacities these physicians served. The record contains no further information regarding these physicians.

The record also contains evidence concerning Chicago HMO procedures for obtaining health care. Chicago HMO's "Member Handbook" told members in need of medical care to *"Call your Chicago HMO doctor first* when you experience an emergency or begin to feel sick." (Emphasis in original.) Also, Chicago HMO gave its contract physicians a "Provider Manual." The manual contains certain provisions with which the providers are expected to comply. The manual contains a section entitled, "The Appointment System/Afterhours Care," which states that all HMO sites are statutorily required to maintain an appointment system for their patients.

Dr. Trubitt testified that Chicago HMO encouraged its providers to maintain an appointment system and also "to retain open spaces on their schedules so that patients who came in as walk-ins could be seen." Retaining space on the schedule for walk-ins was recommended because it offers quicker access to care, keeping patients out of the emergency room with its increased costs, and because, historically, the Medicaid patient population often did not make or keep appointments.

Dr. Jordan related that his office worked on an appointment system and had its own written procedures and forms for handling patient calls and appointments. When a patient called and Dr. Jordan was not in the office, written forms were used by his staff or his answering service to relay the information to him. If Dr. Jordan was in the office, the procedure was as follows:

"Q. *** [I]f it was a routine appointment for the purpose

of having a routine shot or checkup, [the office staff] could make the appointment themselves?

A. Yes.

Q. But if the caller calls and says there is some problem, then they would take the temperature and find out the complaints and refer that call to you; is that correct?

A. That's correct.

Q. And you were the one who would make the determination as to whether or not to schedule an appointment, is that correct?

A. Medical decision, yes.

Q. Medical decision. And I assume there were times when people would call and after you reviewed the information and talked to them that you decided that they didn't need the appointment; is that correct?

A. Of course.

Q. In other words, you would perform some type of triage over the telephone; is that correct?

A. Yes."

Three agreements appear in the record. First, Chicago HMO and the Department of Public Aid entered into a 1990 "AGREEMENT FOR FURNISHING HEALTH SERVICES." This agreement was "for the delivery of medical services to Medicaid recipients on a prepaid capitation basis." Jones and her children, Medicaid recipients, fall within the agreement's definition of beneficiaries.

The preamble to the agreement stated that Chicago HMO "is organized primarily for the purpose of providing health care services." It continued: "[Chicago HMO] warrants that it is able to provide the medical care and services required under this Agreement in accordance with prevailing community standards, and is able to provide these services promptly, efficiently, and economically."

Article V of the agreement described various duties of Chicago HMO, as follows. Chicago HMO "shall provide or arrange to have provided all covered services to all Beneficiaries under this Agreement." Chicago HMO

"shall provide all Beneficiaries with medical care consistent with prevailing community standards." In addition, a section entitled "Choice of Physicians" provided in relevant part:

"[Chicago HMO] shall afford to each Beneficiary a health professional who will supervise and coordinate his care, and, to the extent feasible within appropriate limits established by [Chicago HMO] and approved by the Department, shall afford the Beneficiary a choice of a physician.

There shall be at least one full-time equivalent, board eligible physician to every 1,200 enrollees, including one full-time equivalent, board certified primary care physician for each 2,000 enrollees. *** There shall be *** one pediatrician for each 2,000 enrollees under age 17."

Another article V duty stated that, although Chicago HMO may furnish the services required by the agreement by means of subcontractors, Chicago HMO "shall remain responsible for the performance of the subcontractors."

Regarding appointments, this agreement stated that Chicago HMO "shall encourage members to be seen by appointment, except in emergencies." The agreement also stated that "[m]embers with more serious or urgent problems not deemed emergencies shall be triaged and provided same day service, if necessary," and that "emergency treatment shall be available on an immediate basis, seven days a week, 24-hours a day." Finally, the agreement directed that Chicago HMO "shall have an established policy that scheduled patients shall not routinely wait for more than one hour to be seen by a provider and no more than six appointments shall be made for each primary care physician per hour."

The record also contains a second agreement, a 1990 "MEDICAL GROUP SERVICE AGREEMENT" between Chicago HMO and Dr. Jordan, that lists a Chicago Heights office address for Dr. Jordan. This agreement described numerous duties of Dr. Jordan. Pertinent here, Dr. Jordan would provide to Chicago HMO subscribers

specified medical services "of good quality and in accordance with accepted medical and hospital standards of the community." Pursuant to a "PUBLIC AID AMENDMENT TO THE MEDICAL GROUP SERVICE AGREEMENT," Dr. Jordan agreed to "abide by any conditions imposed by [Chicago HMO] as part of [Chicago HMO's] agreement with [the Department]."

The third agreement appearing of record is a second "MEDICAL GROUP SERVICE AGREEMENT" between Chicago HMO and Dr. Jordan. This agreement was entered into in 1987 and lists a Homewood office address for Dr. Jordan.

Both agreements between Chicago HMO and Dr. Jordan provided for a capitation method of compensation. Under capitation, Chicago HMO paid Dr. Jordan a fixed amount of money for each member who selected Dr. Jordan as the member's primary care provider. In exchange, Dr. Jordan agreed to render health care to his enrolled Chicago HMO members in accordance with the Chicago HMO health plan. Dr. Jordan was paid the same monthly capitation fee per member regardless of the services he rendered. For example, for each female patient under two years old, Chicago HMO paid Dr. Jordan $34.19 per month regardless of whether he treated that patient. In addition, Chicago HMO utilized an incentive fund for Dr. Jordan. Certain costs such as inpatient hospital costs were paid from this fund. Chicago HMO would then pay Dr. Jordan 60% of any remaining, unused balance of the fund at the end of each year.

As earlier noted, the appellate court affirmed the circuit court's grant of summary judgment in favor of Chicago HMO as to count I, institutional negligence, and as to count III, breach of contract. 301 Ill. App. 3d 103. We are asked to decide whether Chicago HMO was properly awarded summary judgment on these two counts.

## ANALYSIS

We conduct *de novo* review of an award of summary judgment. *Olson v. Etheridge*, 177 Ill. 2d 396, 404 (1997). Summary judgment is proper where the pleadings, depositions, admissions, affidavits and exhibits on file, when viewed in the light most favorable to the nonmoving party, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *Busch v. Graphic Color Corp.*, 169 Ill. 2d 325, 333 (1996). Summary judgment is a drastic remedy and should be allowed only when the right of the moving party is clear and free from doubt. *Colvin v. Hobart Brothers*, 156 Ill. 2d 166, 169-70 (1993).

This court first addressed a question of whether an HMO could be held liable for medical malpractice in *Petrovich v. Share Health Plan of Illinois, Inc.*, 188 Ill. 2d 17, 29 (1999). *Petrovich*, however, involved different legal theories of liability than those presented here. *Petrovich* held that an HMO may be held vicariously liable for the medical malpractice of its independent-contractor physicians under both the doctrines of apparent authority and implied authority. *Petrovich*, 188 Ill. 2d 17. In contrast, this appeal focuses on whether an HMO may be held liable under the theory of institutional negligence.

### I. Institutional Negligence

Institutional negligence is also known as direct corporate negligence. Since the landmark decision of *Darling v. Charleston Community Memorial Hospital*, 33 Ill. 2d 326 (1965), Illinois has recognized that *hospitals* may be held liable for institutional negligence. *Darling* acknowledged an independent duty of hospitals to assume responsibility for the care of their patients. Ordinarily, this duty is administrative or managerial in character. *Advincula v. United Blood Services*, 176 Ill. 2d 1, 28 (1996) (and authorities cited therein). To fulfill this duty, a hospital must act as would a "reasonably careful

hospital" under the circumstances. *Advincula*, 176 Ill. 2d at 29. Liability is predicated on the hospital's own negligence, not the negligence of the physician.

Underlying the tort of institutional negligence is a recognition of the comprehensive nature of hospital operations today. The hospital's expanded role in providing health care services to patients brings with it increased corporate responsibilities. As *Darling* explained: "Present-day hospitals, as their manner of operation plainly demonstrates, do far more than furnish facilities for treatment. They regularly employ on a salary basis a large staff of physicians, nurses and internes, as well as administrative and manual workers, and they charge patients for medical care and treatment, collecting for such services, if necessary, by legal action." *Darling*, 33 Ill. 2d at 332. Expounding on the point, this court later stated: "[A] modern hospital *** is an amalgam of many individuals not all of whom are licensed medical practitioners. Moreover, it is clear that at times a hospital functions far beyond the narrow sphere of medical practice." *Greenberg v. Michael Reese Hospital*, 83 Ill. 2d 282, 293 (1980). Thus, in recognizing hospital institutional negligence as a cause of action, *Darling* merely applied principles of common law negligence to hospitals in a manner that comports with the true scope of their operations. See *Darling*, 33 Ill. 2d at 331 (noting that the duty in negligence cases is always the same, to conform to the legal standard of reasonable conduct in light of the apparent risk).

In accordance with the preceding rationale, we now hold that the doctrine of institutional negligence may be applied to HMOs. This court in *Petrovich* acknowledged the potential for applying this theory to HMOs. See *Petrovich*, 188 Ill. 2d at 30 (and authorities cited therein). A court in another jurisdiction has likewise extended the theory of hospital institutional negligence to HMOs.

*Shannon v. McNulty*, 718 A.2d 828 (Pa. Super. Ct. 1998). It did so out of a recognition that HMOs, like hospitals, consist of an amalgam of many individuals who play various roles in order to provide comprehensive health care services to their members. *Shannon*, 718 A.2d at 835-36. Moreover, because HMOs undertake an expansive role in arranging for and providing health care services to their members, they have corresponding corporate responsibilities as well. *Shannon*, 718 A.2d at 835-36; see *Petrovich*, 188 Ill. 2d at 28, 33-40 (recognizing that HMOs act as health care providers and attempt to contain the costs of health care); 215 ILCS 125/1—2(9) (West 1998) (defining an HMO as "any organization formed *** to provide or arrange for one or more health care plans under a system which causes any part of the risk of health care delivery to be borne by the organization or its providers"); *Official Lists Current Amicus Briefs of Labor Department on Medical Malpractice*, 68 U.S.L.W. 2249-50 (November 2, 1999) (noting that, according to the United States Department of Labor, HMOs wear "three different hats," one of which is "medical provider"). Our nationwide research has revealed no decision expressing a contrary view, and Chicago HMO makes no argument against extending the doctrine of institutional negligence to HMOs. Hence, we conclude that the law imposes a duty upon HMOs to conform to the legal standard of reasonable conduct in light of the apparent risk. See *Darling*, 33 Ill. 2d at 331. To fulfill this duty, an HMO must act as would a "reasonably careful" HMO under the circumstances. See *Advincula*, 176 Ill. 2d at 29.

Having determined that institutional negligence is a valid claim against HMOs, we turn to the parties' arguments in this case. Jones contends that Chicago HMO is not entitled to summary judgment on her claim of institutional negligence. She asserts that genuine issues of material fact exist as to whether Chicago HMO (1)

negligently assigned more enrollees to Dr. Jordan than he was capable of serving, and (2) negligently adopted procedures requiring Jones to call first for an appointment before visiting the doctor's office.

Chicago HMO argues that Jones' claim of institutional negligence cannot proceed because she failed to provide sufficient evidence delineating the standard of care required of an HMO in these circumstances. In particular, Chicago HMO contends that Jones should have presented expert testimony on the standard of care required of an HMO.

Jones responds that she has provided sufficient evidence showing the standard of care required of an HMO in these circumstances. She argues further that her claim does not require expert testimony on this point. In support, Jones relies on *Darling*, where a claim of institutional negligence was allowed against a hospital without expert testimony because other evidence established the hospital's standard of care. *Darling*, 33 Ill. 2d 326.

Given that the parties' dispute centers on standard of care evidence and the need for expert testimony, we briefly review the roles of the standard of care and expert testimony in negligence cases. We then discuss *Darling* and its progeny.

The elements of a negligence cause of action are a duty owed by the defendant to the plaintiff, a breach of that duty, and an injury proximately caused by the breach. *Cunis v. Brennan*, 56 Ill. 2d 372, 374 (1974). The standard of care, also known as the standard of conduct, falls within the duty element. Dean Prosser has explained:

"It is better to reserve 'duty' for the problem of the relation between individuals which imposes upon one a legal obligation for the benefit of the other, and to deal with particular conduct in terms of a legal standard of what is required to meet the obligation. In other words, 'duty' is a question of whether the defendant is under any obligation

for the benefit of the particular plaintiff; and in negligence cases, the duty is always the same, to conform to the legal standard of reasonable conduct in light of the apparent risk. *What the defendant must do, or must not do, is a question of the standard of conduct required to satisfy the duty.* The distinction is one of convenience only, and it must be remembered that the two are correlative, and one cannot exist without the other.

A duty, in negligence cases, may be defined as an obligation, to which the law will give recognition and effect, to conform to a particular standard of conduct toward another." (Emphasis added.) W. Prosser, Torts, at 324 (4th ed. 1971).

In an ordinary negligence case, the standard of care required of a defendant is to act as would an " 'ordinarily careful person' " or a " 'reasonably prudent' person." *Advincula v. United Blood Services*, 176 Ill. 2d 1, 22 (1996), quoting *Cunis*, 56 Ill. 2d at 376. No expert testimony is required in a case of ordinary negligence. See *Advincula*, 176 Ill. 2d at 24.

In contrast, in a professional negligence case, the standard of care required of a defendant is to act as would an "ordinarily careful professional." *Advincula*, 176 Ill. 2d at 23. Pursuant to this standard of care, professionals are expected to use the same degree of knowledge, skill and ability as an ordinarily careful professional would exercise under similar circumstances. *Advincula*, 176 Ill. 2d at 23-24. Expert testimony is usually required in a case of professional negligence. *Advincula*, 176 Ill. 2d at 24, 38. Expert testimony is necessary to establish both (1) the standard of care expected of the professional and (2) the professional's deviation from the standard. See *Purtill v. Hess*, 111 Ill. 2d 229, 242 (1986). The rationale for requiring expert testimony is that a lay juror is not skilled in the profession and thus is not equipped to determine what constitutes reasonable care in professional conduct without the help of expert testimony. *Advincula*, 176 Ill. 2d at 24; see *Purtill*, 111 Ill. 2d at 246.

In Illinois, a professional standard of care has been applied in cases involving a variety of both medical and nonmedical professions, such as law and dentistry. *Advincula*, 176 Ill. 2d at 23-24 (and cases cited therein).

The foregoing principles of law establish that the crucial difference between ordinary negligence and professional malpractice actions is the necessity of expert testimony to establish the standard of care and that its breach was the cause of the plaintiff's injury. Although not applicable to this case, there are exceptions to the requirement of expert testimony in professional negligence cases. For example, in instances where the professional's conduct is so grossly negligent or the treatment so common that a lay juror could readily appraise it, no expert testimony or other such relevant evidence is required. *Advincula*, 176 Ill. 2d at 24 (and cases cited therein); *Walski v. Tiesenga*, 72 Ill. 2d 249, 257 (1978) (noting that examples of this exception in medical malpractice cases include instruments left in a patient's body after surgery and X-ray burns); see also *Ohligschlager v. Proctor Community Hospital*, 55 Ill. 2d 411 (1973) (holding that a drug manufacturer's instructions provided the proper standard of care with which to measure the conduct of a physician).

As Jones correctly notes, the institutional negligence of hospitals can also be determined without expert testimony in some cases. The standard of care evidence required to bring an action for institutional negligence against a hospital is best understood by a review of the relevant case law.

In *Darling v. Charleston Community Memorial Hospital*, 33 Ill. 2d 326 (1965), the plaintiff had his leg placed in a cast at the defendant hospital. While remaining at the hospital, he suffered a serious case of gangrene. He ultimately lost his leg below the knee. The plaintiff brought an action directly against the hospital for failing

to have trained nurses monitor his condition and for failing to review his treatment. In support of his argument that the hospital breached the standard of care required of hospitals in this regard, the plaintiff presented evidence that the hospital breached its own bylaws, as well as the state's licensing regulations and the "Standards for Hospital Accreditation." *Darling*, 33 Ill. 2d at 330-32. A jury returned a verdict for the plaintiff, and this court affirmed. *Darling*, 33 Ill. 2d at 328.

As earlier noted, this court in *Darling* recognized an independent duty of hospitals to assume responsibility for the care of their patients. Relevant here, *Darling* also held that the hospital bylaws, licensing regulations, and standards for hospital accreditation were sufficient evidence with which to establish the hospital's standard of care. *Darling* likened this evidence to evidence of custom, which may also be used to determine a hospital's standard of care. The jury was therefore entitled to conclude from the plaintiff's evidence that the hospital had breached its duty to the plaintiff. *Darling*, 33 Ill. 2d at 330-33.

In *Greenberg v. Michael Reese Hospital*, 83 Ill. 2d 282 (1980), a group of plaintiffs sued the hospital for injuries that they sustained as a result of being X-rayed without a protective shield. As standard of care evidence, the plaintiffs presented an expert witness who was a health physicist specializing in the effects of radiation. The hospital challenged the qualifications of plaintiffs' expert, claiming that, since he was not a physician practicing in any school of medicine, he could not testify concerning conduct that involves a medical judgment. This court held that the affidavit of the plaintiffs' nonphysician expert was sufficient to withstand the hospital's motion for summary judgment. *Greenberg*, 83 Ill. 2d at 293-94. Although the expert was not a medical practitioner, he was highly qualified and familiar with radiation therapy

in hospitals. This court deemed "it appropriate to the diversity inherent in hospital administration that a broad range of evidence be available to establish the applicable standard of care." *Greenberg*, 83 Ill. 2d at 293.

More recently, this court in *Advincula v. United Blood Services*, 176 Ill. 2d 1, 29 (1996), stated that the standard of care required a hospital in a case of institutional negligence may be shown by a wide variety of evidence, including, but not limited to, expert testimony, hospital bylaws, statutes, accreditation standards, custom and community practice. *Advincula* explained that this variety of evidence is appropriate given the inherent diversity in hospital administrative and managerial actions, only a portion of which involves the exercise of medical judgment. *Advincula*, 176 Ill. 2d at 32-34. *Advincula* further explained, however, that the tort of institutional negligence "does not encompass, whatsoever, a hospital's responsibility for the conduct of its *** medical professionals." *Advincula*, 176 Ill. 2d at 31. Rather, in cases against hospitals based on vicarious liability for the conduct of medical professionals, the standard of care remains the standard applied to all professionals, *i.e.*, to use the same degree of knowledge, skill and ability as an ordinarily careful professional would exercise under similar circumstances. *Advincula*, 176 Ill. 2d at 30, 31.

*Darling* and its progeny have firmly established that, in an action for institutional negligence against a hospital, the standard of care applicable to a hospital may be proved via a number of evidentiary sources, and expert testimony is not always required. *Advincula*, 176 Ill. 2d at 29-34; *Greenberg*, 83 Ill. 2d at 293-94; *Darling*, 33 Ill. 2d at 330-33. We likewise conclude that, in an action for institutional negligence against an HMO, the standard of care applicable to an HMO may be proved through a number of evidentiary sources, and expert testimony is not necessarily required. Accordingly, expert

testimony concerning the standard of care required of an HMO is not a prerequisite to Jones' claim. Nonetheless, Jones, as the plaintiff here, still bears the burden of establishing the standard of care required of an HMO through other, proper evidentiary sources. We must therefore evaluate the evidence presented on this point to determine whether Jones' claim withstands Chicago HMO's motion for summary judgment. In deciding whether Jones' standard of care evidence is sufficient, we look to whether that evidence can equip a lay juror to determine what constitutes the standard of care required of a "reasonably careful HMO" under the circumstances of this case.

### A. Patient Load

We first consider Jones' assertion that Chicago HMO negligently assigned more patients to Dr. Jordan than he was capable of serving. Parenthetically, we note that this assertion involves an administrative or managerial action by Chicago HMO, not the professional conduct of its physicians. Therefore, this claim properly falls within the purview of HMO institutional negligence. Jones argues that the standard of care evidence in the record is sufficient to support her claim. She points to Dr. Trubitt's testimony, as well as the contract between Chicago HMO and the Department of Public Aid.

Dr. Trubitt was the medical director for Chicago HMO. He testified that, when Chicago HMO entered into agreements with primary care physicians, it considered the number of patients that the physician is capable of handling. The HMO would look to federal "guidelines" in making this determination. Based on those guidelines, Dr. Trubitt expressed 3,500 as the maximum number of patients that should be assigned to any one primary care physician. He stated that, if Dr. Jordan himself had 6,000 or more patients, then that would be an unusually large number and of concern to Chicago HMO.

We agree with Jones that Dr. Trubitt's testimony is proper and sufficient evidence of the standard of care on this issue. According to Dr. Trubitt, an HMO should not assign more than 3,500 patients to any single primary care physician. Chicago HMO even concedes in its brief that the maximum patient load to which Dr. Trubitt testified "represent[s] a 'standard of care' whose violation could affect the quality of patient care." This particular standard of care evidence, setting forth a limit of 3,500 patients per primary care physician, is adequate to equip a lay juror to determine what constitutes the standard of care required of a "reasonably careful HMO" under the circumstances of this case. Whether Dr. Trubitt relied on an unidentified federal regulation or some other source in arriving at a maximum patient load of 3,500 is of no consequence. It is enough that Chicago HMO, through its medical director, admitted that it used the 3,500 limit as a guide in assigning patient loads. See *Darling*, 33 Ill. 2d at 330-33 (holding that the hospital's own bylaws may be used to establish the hospital's standard of care).

Chicago HMO, however, submits that there is no evidence in the record that Dr. Jordan's patient load exceeded 3,500. We disagree. Chicago HMO's "Provider Capitation Summary Reports" listed Dr. Jordan as being the primary care provider of 4,527 Chicago HMO members as of December 1, 1990. Thus, Chicago HMO's own records show Dr. Jordan's patient load as exceeding the 3,500 limit by more than 1,000 patients. In addition, Dr. Jordan estimated that he himself was designated the primary care physician for an additional 1,500 members of other HMOs. He also maintained his own private practice of non-HMO patients. This evidence supports Jones' theory that Dr. Jordan had more than 6,000 HMO patients.

Chicago HMO, in support of its position, points to Dr. Jordan's testimony that he employed four part-time physicians in his office. We disagree with Chicago HMO

concerning the significance of this testimony. Although Dr. Jordan testified that he employed four part-time physicians, he never explained in what capacities these physicians served. In fact, the record contains no further information regarding these physicians. Notably, the agreements between Chicago HMO and Dr. Jordan do not refer to any physicians other than Dr. Jordan himself. The evidence in the record, therefore, supports Jones' theory that Chicago HMO negligently assigned more than 3,500 patients to Dr. Jordan himself. At best, the testimony regarding the four part-time physicians creates a genuine issue of material fact as to how many patients Dr. Jordan actually served himself. Consequently, this limited information in the record about part-time physicians does not entitle Chicago HMO to summary judgment. As earlier noted, it is well established that summary judgment is a drastic remedy and should be awarded only where the right of the moving party is clear and free from doubt.

Chicago HMO also submits that Jones' claim of patient overload must fail because there is no evidence of a causal connection between the number of patients that Dr. Jordan was serving and his failure to schedule an appointment to see Shawndale. We disagree. We can easily infer from this record that Dr. Jordan's failure to see Shawndale resulted from an inability to serve an overloaded patient population. A lay juror can discern that a physician who has thousands more patients than he should will not have time to service them all in an appropriate manner.

We note, moreover, that additional evidence in the record supports Jones' claim. The record indicates that Chicago HMO was actively soliciting new members door-to-door around the same time that it lacked the physicians willing to serve those members. Jones described how she first enrolled in Chicago HMO while living in

Park Forest. A Chicago HMO representative visited her home and persuaded her to become a member, telling her that Chicago HMO "is better than a regular medical card." When Jones later moved to Chicago Heights, another Chicago HMO representative visited her home. Jones explained that this meeting was not arranged in advance. Rather, the representative was "in the building knocking from door to door." Jones also testified that, when she moved to Chicago Heights, Chicago HMO assigned Dr. Jordan to her and did not give her a choice of primary care physicians.

The latter aspect of Jones' testimony was supported by Dr. Trubitt. He explained that, before Chicago HMO and Dr. Jordan executed the Chicago Heights service agreement, another physician serviced that area. When Chicago HMO terminated that other physician, Dr. Jordan agreed "to go into the [Chicago Heights] area and serve the patients." Chicago HMO then assigned to Dr. Jordan all of the patients of that physician. Chicago HMO directed its members to Dr. Jordan; they had no other choice of a physician because "[a]t that point in the area there was no choice." According to Dr. Trubitt, Dr. Jordan was Chicago HMO's only physician who was willing to serve the public aid membership in Chicago Heights. Dr. Trubitt stated that this lack of physicians was "a problem" for Chicago HMO.

The record further reflects that Chicago HMO directed its Chicago Heights members to Dr. Jordan, even though it knew that Dr. Jordan worked at that location only half the time. Chicago HMO entered into two service agreements with Dr. Jordan, the first for a Homewood site in 1987, and the second for the Chicago Heights site in 1990. Dr. Trubitt indicated that Chicago HMO and Dr. Jordan executed the Chicago Heights service agreement at the time that Chicago HMO terminated the other physician. Dr. Jordan confirmed that, in January of

1991, he was dividing his time equally between his two offices. All of the foregoing evidence supports Jones' theory that Chicago HMO acted negligently in assigning more enrollees to Dr. Jordan than he was capable of handling.

Jones also relies on the contract between Chicago HMO and the Department of Public Aid as standard of care evidence. That contract stated that Chicago HMO shall have one full-time equivalent primary care physician for every 2,000 enrollees. We need not address in this appeal whether this contractual provision may serve as standard of care evidence. Our role here is to determine whether Chicago HMO is entitled to summary judgment on the patient overload aspect of the institutional negligence claim. Even if this contractual provision is removed from consideration, Chicago HMO is not entitled to summary judgment. Accordingly, we express no opinion on whether this provision may properly serve as standard of care evidence.

One final matter with respect to patient load remains to be considered. Chicago HMO contends that imposing a duty on HMOs to ascertain how many patients their doctors are serving would be unreasonably burdensome. Chicago HMO asserts that only physicians, and not HMOs, should have the duty to determine if the physician has too many patients.

To determine whether a duty exists in a certain instance, a court considers the following factors: (1) the reasonable foreseeability of injury, (2) the likelihood of injury, (3) the magnitude of the burden of guarding against the injury, and (4) the consequences of placing that burden upon the defendant. *Deibert v. Bauer Brothers Construction Co.*, 141 Ill. 2d 430, 437-38 (1990); *Kirk v. Michael Reese Hospital & Medical Center*, 117 Ill. 2d 507, 526 (1987). Lastly, the existence of a duty turns in large part on public policy considerations. *Ward v. K mart*

*Corp.*, 136 Ill. 2d 132, 151 (1990); see *Mieher v. Brown*, 54 Ill. 2d 539, 545 (1973). Whether a duty exists is a question of law to be determined by the court. *Cunis*, 56 Ill. 2d at 374.

Here, given the circumstances of this case, we hold that Chicago HMO had a duty to its enrollees to refrain from assigning an excessive number of patients to Dr. Jordan. HMOs contract with primary care physicians in order to provide and arrange for medical care for their enrollees. It is thus reasonably foreseeable that assigning an excessive number of patients to a primary care physician could result in injury, as that care may not be provided. For the same reason, the likelihood of injury is great. Nor would imposing this duty on HMOs be overly burdensome. Here, for example, Chicago HMO needed only to review its ''Provider Capitation Summary Reports'' to obtain the number of patients that it had assigned to Dr. Jordan. This information is likely to be available to all HMOs, as they must know the number of patients that a physician is serving in order to compute the physician's monthly capitation payments. The HMO may also simply ask the physician how many patients the physician is serving. Finally, the remaining factors favor placing this burden on HMOs as well. Public policy would not be well served by allowing HMOs to assign an excessive number of patients to a primary care physician and then "wash their hands" of the matter. The central consequence of placing this burden on HMOs is HMO accountability for their own actions. This court in *Petrovich* recognized that HMO accountability is needed to counterbalance the HMO goal of cost containment and, where applicable, the inherent drive of an HMO to achieve profits. *Petrovich*, 188 Ill. 2d at 29.

In conclusion, Chicago HMO is not entitled to summary judgment on Jones' claim of institutional negligence for assigning too many patients to Dr. Jordan.

## B. Appointment Procedures

We next consider Jones' assertion that Chicago HMO negligently adopted procedures requiring Jones to call first for an appointment before visiting the doctor's office or obtaining emergency care. Jones fails to develop this argument in her brief. In particular, she points to no evidence in the record as providing the standard of care required of an HMO in developing appointment procedures. This claim cannot proceed without standard of care evidence. Chicago HMO is therefore entitled to summary judgment with respect to this portion of Jones' claim of institutional negligence.

## II. Breach of Contract

Jones argues that Chicago HMO is not entitled to summary judgment on her breach of contract claim. This claim, set forth in count III of Jones' complaint, is based solely on the contract between Chicago HMO and the Department of Public Aid. Jones is not a signatory to this contract, but rather a beneficiary. Jones, however, expressly disclaims any reliance on a third-party beneficiary theory of liability. Instead, Jones insists that she may maintain an action for damages against Chicago HMO as if she were a party to the agreement.

The appellate court held that summary judgment was properly awarded to Chicago HMO on this claim because Jones is not a party to the contract at issue. The appellate court also noted that Jones' theory of liability in this regard was "murky at best." 301 Ill. App. 3d at 115.

We hold that Chicago HMO is entitled to summary judgment on count III. The record discloses that Jones is not a party to the contract that she seeks to enforce. Rather, the contracting parties are Chicago HMO and the Department. Nonetheless, Jones insists that she may maintain a cause of action on that contract, while also

disclaiming any reliance on a third-party beneficiary theory of liability. Jones' position is not correct as a matter of law. See *Olson v. Etheridge*, 177 Ill. 2d 396, 404 (1997) (explaining third-party beneficiary theory); 17A Am. Jur. 2d *Contracts* §§ 435, 437 (2d ed. 1991) (noting that a nonparty to a contract must sue under a third-party beneficiary theory). We also agree with the appellate court that the theory presented by Jones on this point is not clear.

### III. Breach of Warranty

Jones lastly argues that she should be permitted to pursue a breach of warranty claim against Chicago HMO. She asserts that count III can be construed as raising this claim. Chicago HMO counters that Jones has waived any breach of warranty claim by failing to raise it in the courts below. We agree with Chicago HMO. Issues raised for the first time on appeal are waived. *Employers Insurance v. Ehlco Liquidating Trust*, 186 Ill. 2d 127, 161 (1999). Our review of the record reveals that Jones did not raise this claim in either the circuit court or the appellate court. Nor did Jones raise this issue in her petition for leave to appeal. We thus conclude that Jones has waived any claim of breach of warranty.

### CONCLUSION

An HMO may be held liable for institutional negligence. Chicago HMO is not entitled to summary judgment on Jones' claim charging Chicago HMO with institutional negligence for assigning more enrollees to Dr. Jordan than he was capable of serving. We therefore reverse the award of summary judgment to Chicago HMO on count I of Jones' second amended complaint and remand that claim to the circuit court for further proceedings. As to count III, we affirm the award of summary judgment to Chicago HMO.

The judgments of the appellate and circuit courts are

affirmed in part and reversed in part and the cause is remanded to the circuit court.

*Judgments affirmed in part and reversed in part; cause remanded.*

JUSTICE MILLER, concurring in part and dissenting in part:

I agree with the majority that the trial court properly granted the defendant's motion for summary judgment on count III of the plaintiff's second amended complaint, which alleges breach of contract. I do not agree with the majority's conclusion that summary judgment is not also appropriate on count I, which alleges institutional negligence.

The majority opinion correctly notes that the defendant makes no argument against extending the doctrine of institutional negligence to health maintenance organizations, such as the defendant. 191 Ill. 2d at 293. In this regard, Justice Rathje's separate opinion would grant the defendant more extensive relief than the defendant itself requests, by ruling in its favor on an issue much broader than the one actually raised by the HMO, and for that reason I cannot join his partial concurrence and dissent. The defendant does argue, however, that summary judgment was proper on count I because there is no evidence of a causal connection between the number of patients assigned to Dr. Jordan by the defendant and the doctor's failure to schedule an immediate appointment to see the plaintiff's daughter.

Reaching a contrary conclusion, the majority accepts the plaintiff's assertion that a genuine issue of material fact exists regarding whether the number of patients assigned by the defendant to Dr. Jordan was a proximate cause of the plaintiff's injury. In support of this result, the majority states, "We can easily infer from this record that Dr. Jordan's failure to see Shawndale resulted from an inability to serve an overloaded patient population. A

lay juror can discern that a physician who has thousands more patients than he should will not have time to service them all in an appropriate manner." 191 Ill. 2d at 301.

The majority emphasizes Dr. Trubitt's deposition testimony, in which Dr. Trubitt stated that 6,000 to 6,500 patients would be an unusually large load for a doctor to carry. The majority ignores Dr. Trubitt's further testimony on this subject, however, in which he explained that the number of patients formally assigned to a particular doctor may be expanded, if there are additional doctors in the office and the hours of operation for the office are increased.

But even this testimony is insufficient to give rise to a genuine issue of material fact, for the plaintiff presents no support for the allegation that the injury was proximately caused by the number of patients assigned by the defendant to Dr. Jordan. As the trial judge reasoned in granting summary judgment to the defendant on this portion of the plaintiff's second amended complaint:

"[Plaintiff's counsel] comes up with some theories. He comes up with some numbers. But, you know, there's no nexus. There's no expert testimony to show how these claimed theories and numbers, omissions, or failures had any impact on the doctor's decisions in this case."

The appellate court made the same point, similarly noting the absence of any evidence in the record specifically linking the size of Dr. Jordan's patient load in January 1991 with the negligence alleged by the plaintiff, the failure to schedule an immediate appointment for her daughter. 301 Ill. App. 3d 103, 111.

Whether Dr. Jordan and the other physicians in his practice together served 1,000 patients, 3,000 patients, 5,000 patients, or more, the majority cites nothing in the record before us from which one may infer that Dr. Jordan's failure to schedule an immediate appointment to see the plaintiff's daughter on the day in question was

the result of the number of patients assigned to and served by his office. I believe that summary judgment in the defendant's favor was proper on count I, and therefore I would affirm that portion of the judgment below.

JUSTICE RATHJE, also concurring in part and dissenting in part:

I agree with both the majority's affirmance of summary judgment on the breach of contract claim and its determination that plaintiff has waived the breach of warranty claim. I strongly disagree, however, with the majority's holding that Chicago HMO can be liable under a theory of institutional liability.

The majority reasons that, because an HMO is an "amalgam of many individuals" like a hospital, then Chicago HMO can be institutionally liable under the rule set forth in *Darling v. Charleston Community Memorial Hospital*, 33 Ill. 2d 326 (1965). 191 Ill. 2d at 293. Although both a hospital and an HMO hire many different people for many different reasons, the reasons for holding hospitals liable under this theory do not hold true for Chicago HMO.

Generally, institutional liability attaches when an organization breaches a duty it owes as an organization.[1] Under *Darling*, hospitals are vulnerable to institutional liability partly because, as organizations, they offer complete medical services, including nurses, doctors, orderlies, and administration. *Darling*, 33 Ill. 2d at 332. Hospital facilities include both the place and the staff, and hospitals "assume certain responsibilities for the care of the patient." *Darling*, 33 Ill. 2d at 332. In *Darling*, the hospital was negligent for two reasons: it failed to properly review the work of an independent doctor, and

---

[1]Contrast with vicarious liability, which attaches to an organization when one of its agents breaches his duty.

its nurses failed to administer necessary tests. *Darling*, 33 Ill. 2d at 333. The rule set forth in *Darling* is that a hospital must act as a reasonably careful hospital would and is responsible for reviewing and supervising the medical care given to its patients. *Advincula v. United Blood Services*, 176 Ill. 2d 1, 28-29 (1996).

*Shannon v. McNulty*, 718 A.2d 828 (Pa. Super. 1998), the case upon which the majority relies, is perfectly consistent with the principles set forth in *Darling* and *Avincula*. In *Shannon*, the defendant HMO was not serving simply as a vehicle through which a member's medical bills are paid. Instead, the HMO employed nurses to work its own triage service and to advise members on medical decisions such as whether to seek treatment at a hospital. *Shannon*, 718 A.2d at 832-33. The court concluded:

> "Where the HMO is *providing health care services rather than merely providing money to pay for services* their conduct should be subject to scrutiny. We see no reason why the duties applicable to hospitals should not be equally applied to an HMO *when that HMO is performing the same or similar functions as a hospital*. When a benefits provider, be it an insurer or a managed care organization, interjects itself into the rendering of medical decisions affecting a subscriber's care it must do so in a medically reasonable manner. Here, HealthAmerica provided a phone service for emergent care staffed by triage nurses. Hence, it was under a duty to oversee that the dispensing of advice by those nurses would be performed in a medically reasonable manner. Accordingly, we now make explicit that which was implicit in *McClellan* [*v. Health Maintenance Organization of Pennsylvania*, 413 Pa. Super. 128, 604 A.2d 1053 (1992)] and find that HMOs may, *under the right circumstances*, be held corporately liable." (Emphasis added.) *Shannon*, 718 A.2d at 835-36.

The passage demonstrates why Chicago HMO is not subject to institutional liability. Under Chicago HMO's contract with Dr. Jordan, Chicago HMO is responsible for enrolling members, providing the doctor's group with a current list of those members, paying capitation fees,

providing a list of hospitals and health care providers, providing other funding, and obtaining the appropriate regulatory licensure for the doctor's group. The doctor's group is solely responsible for providing the health services. Moreover, Chicago HMO's member's handbook specifically explains that the individual doctors are responsible for nurses and all other medical attention. Unlike the HMO in *Shannon*, which "provid[ed] health care services," Chicago HMO "merely provid[ed] money to pay for services." Thus, institutional liability is inappropriate in this case.

The primary flaw in the majority's analysis is that it attempts to create a rule of general application that fails to take into account not only the differences that exist between a hospital and an HMO but also those that exist among HMOs. To determine whether an HMO should have the same duty to its members that a hospital has to its patients, a court must assess not only whether hospitals are similar to HMOs but also whether the patient's relationship to the hospital is similar to the member's relationship to the HMO. See *Kirk v. Michael Reese Hospital & Medical Center*, 117 Ill. 2d 507, 525 (1987) (the question of whether a duty exists is "whether the defendant and the plaintiff stood in such a relationship to one another that the law imposed upon the defendant an obligation of reasonable conduct for the benefit of the plaintiff").

Hospitals are "institutions holding themselves out as devoted to the care and saving of human life." *Johnson v. St. Bernard Hospital*, 79 Ill. App. 3d 709, 716 (1979). Institutional liability makes sense in the hospital context because a person in need of treatment must be assured that the hospital will abide by a sufficient standard of care. That patient generally does not have the time or opportunity to compare hospital bylaws or look for the hospital with the best administrative policies and the

highest standard of care. A person goes to the nearest hospital in an emergency or to a hospital where his doctor has privileges in a nonemergency. In many cases, including most emergent cases, the patient has no time to make an informed choice. In his relationship with a hospital, the patient is at a severe disadvantage, which the law acknowledges by subjecting hospitals to institutional liability.

By contrast, the goal of an HMO is to provide health care in a cost-sensitive manner. B. Furrow, *Managed Care Organizations and Patient Injury: Rethinking Liability*, 31 Ga. L. Rev. 419, 457 (1997). HMOs offer medical services, but they do not do so in the same way that hospitals do. HMOs offer the funding and the contact with the medical professionals. In Chicago HMO, for instance, the way in which daily business is conducted, the duties of nurses and other staff, and other day-to-day decisions are made by the individual doctor or hospital with whom the HMO has contracted.[2] This type of HMO makes no decision as to what type of care is ultimately given; they only decide whether the HMO will pay for that care.

Moreover, when a person joins an HMO, he knows beforehand what that HMO will cover and, in most cases, chooses which HMO he will join based on his assessment of the costs and benefits. To become a member, that person usually has to contract with the HMO.[3] As a result, the HMO will be held accountable for any failure to comply with its own policies through a contract action.

In this case, the Chicago HMO representative arrived

---

[2]Some HMOs do employ the staff and provide the facilities for care, but most do not. See E. Weiner, *Managed Health Care: HMO Corporate Liability, Independent Contractors, and the Ostensible Agency Doctrine*, 15 J. Corp. L. 535, 540 (1990).

[3]This case is an exception to that rule because the HMO membership was given to plaintiff by the Department of Public Aid. See 191 Ill. 2d at 305-06.

at plaintiff's door and asked her whether she would prefer to receive her public aid medical benefits through the HMO or continue receiving them directly through public aid. He reviewed the policies, and plaintiff made the decision to join, signing a statement that her participation in the HMO was voluntary and that she could disenroll at any time. Plaintiff was given the opportunity to make an informed choice and chose to receive her medical services through an HMO.

Just as hospitals can differ substantially from HMOs, substantial differences may exist among HMOs. Generally, HMOs are organized under one of four major models: (1) staff, in which the providers are all salaried employees of the HMO; (2) medical group, in which the HMO contracts with an organized group of doctors who have combined their practices; (3) independent practice association, in which the HMO contracts with individual physicians who are solo or group practitioners; and (4) network models, in which the HMO contracts with two or more physician group practices who may serve several HMOs at the same time. Both the methods of organization and the methods of reimbursement vary among the models. E. Weiner, *Managed Health Care: HMO Corporate Liability, Independent Contractors, and the Ostensible Agency Doctrine*, 15 J. Corp. L. 535, 540 (1990).

In some cases, an HMO may behave very much like a hospital, and institutional liability might be appropriate in such cases. In most cases, however, an HMO will do everything in its power *not* to behave like a hospital, precisely to avoid the liability that comes with operating as one. Having a uniform standard of care for all HMOs makes little sense, given the major differences in structure.

Before concluding, I wish to stress that I by no means believe that HMOs should not be held accountable for their actions. Ordinarily, an HMO will be accountable to

its members through the contract that is signed by both parties. Unfortunately, in this case, plaintiff was receiving benefits from the HMO through public aid and, therefore, did not contract with the HMO. Consequently, as the majority correctly holds, her particular situation leaves her unable to enforce the policy provisions because she was not a party to the contract. 191 Ill. 2d at 305-06. While I sympathize with plaintiff's unenviable position, the fact remains that plaintiff's theory of liability is not one permissible under our laws.