JUSTICE O’MALLEY delivered the opinion of the court:[1] Plaintiff, Corinne Thompson, both individually and as administrator of the estates of her husband, Trevor Thompson, and their daughter, Amber Thompson, appeals the trial court’s order granting summary judgment on her claims against defendants, Jack E. Leisch and Associates, Inc., and CH2M Hill, Inc., the engineering companies that designed the bridge and traffic interchange in the area where Trevor and Amber were killed in a motor vehicle accident.[2] For the reasons that follow, we reverse the judgment of the trial court and remand for further proceedings. In January 1991, defendants entered into a contract with WDC to design a roadway interchange and a replacement for a bridge deck in connection with a larger project WDC was overseeing, to construct a new shopping mall. In a contract attachment describing the scope of defendants’ services for “Phase I, Stage A I-94/Grand Avenue interchange improvements,” the contract stated that defendants would provide WDC the following services: “A. Roadway Design Final design and contract plan preparation for the Phase 1, Stage A I-94/Grand Avenue interchange improvements will be provided. The proposed roadway improvements are as described below: • Redesign Ramp B to two lanes, but maintain one lane at merge to southbound 1-94. • Provide lane drop recovery area on eastbound Grand Avenue east of Ramp B diverge. • Improve Ramp E alignment. • Proposed improvements are to tie to the widening of Grand Avenue, which is to be done by others. Additional related services to be provided include drainage design, roadway lighting design, and utility adjustments. B. Structural Design Final structural design plans will be provided for deck replacement of the existing Grand Avenue bridge over 1-94. Final structural design plans will also be prepared for a proposed overhead cantilever sign truss on eastbound Grand Avenue, west of Ramp B.” Defendants’ contract also contained a provision stating that “[t]he standard of care for [defendants’] services will be the degree of skill and diligence normally employed by professional engineers or consultants performing the same or similar services.” Defendants proposed structural designs for the bridge deck replacement on the Grand Avenue bridge with a median that was four feet wide and approximately seven inches tall. (The median had been four feet wide and approximately six inches tall.) Defendants completed their designs in April 1991, and the Illinois Department of Transportation (Department) approved of defendants’ proposed designs before it issued a permit to allow construction work to begin. In November 1998, a vehicle traveling east on Grand Avenue lost control, hit the median separating eastbound and westbound traffic, vaulted into the air, and hit the westbound vehicle in which Trevor and Amber were traveling. After Trevor and Amber died as a result of the accident, plaintiff brought suit against defendants for what she alleged was defendants’ negligence in designing the bridge deck without considering or designing a median barrier that would have prevented the eastbound vehicle from becoming airborne and causing the accident. During discovery, plaintiff submitted an affidavit from Andrew Ramisch, a civil engineer who had reviewed the litigation materials and determined that application of “the degree of skill and diligence normally employed by professional engineers or consultants performing the same or similar services” as laid out in defendants’ contract dictated that defendants consider, submit, and design a median barrier to prevent the type of accident that underlies this case.[3] Ramisch also expressed his opinion that “the standard of care *** as it pertained to an assessment for the need of a median barrier for crossover protection was the same whether the design drawings were for a repair or replacement of the bridge deck.” Ramisch opined that defendants “[flailed to properly consider and analyze all of the available data provided by their consultants *** pertaining to traffic capacities, weave lane failures and decreases in operational service at the interchange” that would result from WDC’s overall project. Ramisch said WDC had information that the project would increase traffic by 200% and “create a burden on the interchange.” According to Ramisch, if the design work on the bridge deck had been performed within the standard of care, “more probably than not” a barrier would have been designed that would have prevented the accident, and defendants “[were] aware, or should have been aware, of the vaulting characteristic of the existing median” and “should have been on notice that the proposed work was dangerous and likely to cause injury.” Following a hearing, the trial court granted defendant’s motion for summary judgment on the ground that the contract, which controlled defendants’ duties, “[did] not call for an assessment of the sufficiency of the median barrier” and “[did] not require the defendants to modify or redesign the road surface or the raised median,” but instead indicated that “[t]he road surface was to be removed and replaced by others without modification of the existing design.” The trial court discounted Ramisch’s opinion that the standard of care required consideration of a median barrier, because, according to the trial court, the duties actually laid out in the contract, performed with the requisite care, did not include the study or design of a median barrier. The trial court entered an order making its decision immediately appealable pursuant to Rule 304(a) (210 Ill. 2d R. 304(a)), and plaintiff timely appealed. On appeal, plaintiff challenges the propriety of the trial court’s decision to grant summary judgment to defendants. Summary judgment is proper when the pleadings, depositions, and affidavits demonstrate that no genuine issue of material fact exists and that the moving party is entitled to judgment as a matter of law. 735 ILCS 5/2 — 1005(c) (West 2006). Summary judgment is a drastic means of resolving litigation and should be allowed only when the moving party’s right to judgment is clear and free from doubt. Jackson v. TLC Associates, Inc., 185 Ill. 2d 418, 424 (1998). Thus, in adjudicating a summary judgment motion, a trial court must construe the evidence strictly against the movant and liberally in favor of the nonmoving party. Jackson, 185 Ill. 2d at 423-24. Whether summary judgment is proper in a given case is a question of law, to be reviewed de novo. Founders Insurance Co. v. Munoz, 389 Ill. App. 3d 744, 748-49 (2009). Illinois law is well settled that, to succeed on an action for negligence, the plaintiff must establish that the defendant had a duty to conform to a certain standard of conduct, the defendant failed to meet that standard, and the defendant’s failure was a proximate cause of the plaintiffs injuries. Ferentchak v. Village of Frankfort, 105 Ill. 2d 474, 480 (1985). The parties’ primary dispute centers on whether defendants breached a duty by failing to consider or design an improved median barrier. Whether a duty exists is normally a question of law, and “the answer hinges on whether the parties stood in such a relationship to each other that the law would impose an obligation on the defendant to act reasonably for the protection of the plaintiff.” Raffen v. International Contractors, Inc., 349 Ill. App. 3d 229, 233 (2004). When a defendant is accused of negligence due to its failure to perform an act allegedly required by a contractual obligation, the existence of a duty will be determined by the terms of the contract, and the scope of the defendant’s duty will not be extended beyond those terms. Gilley v. Kiddel, 372 Ill. App. 3d 271, 275 (2007). Therefore, in order to determine whether and to what extent defendants owed plaintiff a duty in this case, we must interpret defendants’ contractual obligations. For a court interpreting a contract, the primary objective is to give effect to the intent of the parties. Gallagher v. Lenart, 226 Ill. 2d 208, 232 (2007). The best indication of the parties’ intent is the contract’s language, given its plain and ordinary meaning. Gallagher, 226 Ill. 2d at 233. Because words derive part of their meaning from the context in which they are used, a court construing a contract must look at the contract as a whole, by viewing each part of the contract in light of the others. Gallagher, 226 Ill. 2d at 233. If the language of a contract is unambiguous, then the court must derive the parties’ intent from the writing itself, without resort to matters extrinsic to the contract. Paul D. Episcope, Ltd. v. Law Offices of Campbell & DiVincenzo, 373 Ill. App. 3d 384, 391 (2007). Plaintiff argues that the contract imposed on defendants a duty to consider, and then design, an improved median barrier. Defendants counter by relying on the plain language of their contract, which required them to submit design plans for a bridge deck “replacement”; they interpret the contract’s use of the word “replacement” to indicate that their role was limited to submitting designs to recreate the bridge deck exactly as it had existed, rather than submitting designs for an improved or altered bridge deck. There is authority both to support defendants’ interpretation of the word “replacement” and to contradict it. Our supreme court has stated that “[t]he word ‘replacement’ has a well-understood meaning. Webster defines the word ‘replace’ as meaning to place again; to restore to a former condition. The word ‘replacement’ is defined to mean the act of replacing, or state of being replaced.” Illinois Central R.R. Co. v. Franklin County, 387 Ill. 301, 309 (1944). However, Webster also defines the word “replace” as “to take the place of’ or to “serve as a substitute for or successor of’ or to “succeed” or “supplant.” Webster’s Third New International Dictionary 1925 (1986). Indeed, this second definition of the word comports with common usage in communications such as commercial advertisements, which often invite consumers to “replace” their old and worn-out goods with new and purportedly better products. Given the competing definitions above, we might have difficulty interpreting the word “replacement” if it stood alone in the contract. However, when we view the contract as a whole, we find additional context to clarify its use of the word. In the paragraph directly preceding the bridge deck replacement paragraph, the contract set out that defendants will prepare plans for “interchange improvements” or “roadway improvements” to an area near the bridge. The contrast between the contract’s use of the word “improvements” in that section and “replacement” in the section relating to bridge work suggests that defendants are correct that the parties to the contract contemplated that defendants would submit plans to rebuild the bridge deck (and accompanying median) exactly as it already existed. See Bank of Ravenswood v. City of Chicago, 307 Ill. App. 3d 161, 166 (1999) (“An improvement is ‘ “[a] valuable addition made to property *** or an amelioration in its condition, amounting to more than mere repairs or replacement ***.” ’ [Citation.]”). We therefore agree with defendants’ interpretation of the word “replacement” as it was used in their contract. However, the contract also stated that defendants were to undertake the roadway improvement and bridge deck replacement tasks by employing “the degree of skill and diligence normally employed by professional engineers or consultants performing the same or similar services.” This provision adds an important qualifier to defendants’ work on the bridge deck — it provides that, in the process of submitting plans to replace the bridge deck, defendants were obligated to act within the prescribed standard of care. Thus, based on the plain language of defendants’ contract, we conclude that they labored under a duty to submit plans to replace the bridge deck as it existed prior to the construction project of which defendants were a part, but they also owed a duty to perform that contractual task using the degree of skill and diligence normally employed by professional engineers. Having determined as a matter of law what duty the contract imposed on defendants, our next question becomes whether plaintiff has presented any evidence to support her claim that defendants breached their duty. We conclude that she has, in the form of Ramisch’s affidavit indicating that an engineer acting within that standard of care while creating plans to replace the bridge deck would have considered and designed an improved median barrier. Defendants argue that we may not consider the Ramisch affidavit to help determine the scope of defendants’ duty or whether they may have breached it, because under Illinois law, “in the absence of ambiguity contract interpretation is a question of law for which expert testimony would not be appropriate.” William Blair & Co. v. FI Liquidation Corp., 358 Ill. App. 3d 324, 338 (2005). However, we interpret the contract independent of the Ramisch affidavit; from the contract’s language alone, we determine that defendants owed a duty to use “the degree of skill and diligence normally employed by professional engineers” when they designed the bridge deck replacement. After interpreting the contract to determine that it imposed on defendants a duty to replace the bridge deck by using the degree of skill and diligence normally employed by professional engineers, we move to the next question: whether defendants’ actions breached that standard of care. It is when we answer this next question that the Ramisch affidavit becomes important. The contract’s articulation of defendants’ standard of care matches the standard of care generally applied to professionals under Illinois law. See Advincula v. United Blood Services, 176 Ill. 2d 1, 23 (1996) (“In Illinois, the established standard of care for all professionals is stated as the use of the same degree of knowledge, skill and ability as an ordinarily careful professional would exercise under similar circumstances”). As our supreme court has explained, “in professional negligence cases, unlike negligence actions in general, the plaintiff bears a burden to establish the standard of care through expert witness testimony.” Advincula, 176 Ill. 2d at 24; see also Jones v. Chicago HMO Ltd., 191 Ill. 2d 278, 295 (2000) (“Expert testimony is necessary to establish both (1) the standard of care expected of the professional and (2) the professional’s deviation from the standard”). This special rule stands to reason for cases involving application of a professional standard of care, because “lay juror[s] [are] not skilled in the profession and thus [are] not equipped to determine what constitutes reasonable care in professional conduct without the help of expert testimony” (Jones, 191 Ill. 2d at 295). See also Plank v. Holman, 46 Ill. 2d 465, 471 (1970) (expert testimony is proper if it offers “knowledge and application of principles of science beyond the ken of the average juror”). Accordingly, although the interpretation of defendants’ contract is indeed a question of law, our interpretation of that contract leads us to conclude that the contract imposed a professional duty of care on defendants’ work, and the extent of that duty (and whether it was breached) creates a factual question subject to expert testimony.[4] The Ramisch affidavit, which states that an engineer charged with applying the professional standard of care in designing the interchange and replacing the bridge deck would have, in light of the increased traffic in the area, studied and designed an improved median barrier regardless of whether the contract mentioned a median barrier, offers at least some evidentiary support for plaintiffs position that defendants breached a professional standard of care by failing to consider or design an improved median barrier. Therefore, taking the record in the light most favorable to plaintiff, as we must do at this stage of proceedings, we conclude that the trial court erred in granting defendants summary judgment on the ground that they breached no duty in designing the bridge deck. We find support for our decision in the First District’s opinion in Billman v. Frenzel Construction Co., 262 Ill. App. 3d 681 (1994). In Billman, a contractor overseeing road work pursuant to previous designs was charged with negligence after a motor vehicle accident occurred on the allegedly dangerous roadway that the contractor had created. Although the contractor had performed its contractual duties as expressly described, the First District relied on an expert’s affidavit, which said that a contractor with the defendant’s experience would have noticed that the designs were dangerous and notified the relevant parties of the defects (Billman, 262 Ill. App. 3d at 683), to conclude that there was at least a material question of fact as to whether the defendant contractor had breached a duty (Billman, 262 Ill. App. 3d at 686). Defendants attempt to distinguish Billman by noting what they term “significant factual differences” between it and this case — the defendant in Billman was a contractor and not an engineer, and the accident in Billman occurred in the defendant’s work area — but these differences do nothing to undermine the applicability of Billman’s basic holding to this case. Defendants further contend that the supreme court’s decision in Ferentchak, a case upon which the trial court also relied, dictates that defendants’ duties must be confined to those explicitly mentioned in the contract, rather than those implicitly incorporated via the contract’s adoption of a professional standard of care. In Ferentchak, the plaintiffs, who suffered flooding damage in their home because its foundation grade level had been set too low, brought an action against, among others, an engineer who had contracted to design and observe the construction of the plaintiffs’ subdivision’s surface water drainage system. Ferentchak, 105 Ill. 2d at 476. The engineer’s designs set out a drainage easement for the entire subdivision (Ferentchak, 105 Ill. 2d at 477), but the plans did not set a foundation grade elevation for any of the individual lots in the subdivision (Ferentchak, 105 Ill. 2d at 478). The supreme court began its analysis by ruling that the engineer’s contract did not create a duty to set the foundation grade levels, but instead specifically provided that the developer of the subdivision “retained control of what was built on the individual lots.” Ferentchak, 105 Ill. 2d at 480-81. (The supreme court also noted that the developer accepted the engineer’s plans even though they did not indicate foundation grade levels for the individual homes. Ferentchak, 105 Ill. 2d at 481.) The supreme court next considered the plaintiffs’ argument that the engineer breached a duty to exercise a proper degree of professional care (Ferentchak, 105 Ill. 2d at 481); the court rejected that argument because, under the engineer’s contract, which defined the scope of the duty to exercise professional care, the engineer “was not in a position to set the foundation elevations for the individual lots at the time he developed the water drainage plans” (Ferentchak, 105 Ill. 2d at 482). It further noted that the engineer “did not know what type of custom homes were to be built on each lot” and thus “could not [have been] expected to set these grade elevations” (Ferentchak, 105 Ill. 2d at 482), and it thus held that it would not impose on an engineer a duty to set foundation grade levels for individual lots “when the engineer does not have adequate information with respect to the type of structures to be erected to enable him to set the foundation levels accurately.” Ferentchak, 105 Ill. 2d at 483. Defendants argue that, as applied here, Ferentchak forbids the imposition of a duty to consider and then design an improved median, because, like the contract in Ferentchak, the contract here does not mention explicitly any such duty. We do not read Ferentchak so broadly. As we read the decision in Ferentchak, the supreme court held the engineer’s contract to have created no duty regarding the foundations not because foundations were not explicitly listed among the engineer’s duties in the contract, but because the contract indicated that the engineer was to have no involvement in setting the foundation levels and it would have been impossible for the engineer to do so when the types of structures to be built on the individual lots had yet to be determined. In other words, we read the decision as relying on the idea that the engineer had no involvement in the foundation levels and had inadequate information to offer any input, thus making it impossible for the engineer to do what the plaintiffs argued he should have done. We have a different situation here. Defendants in this case, unlike the engineer in Ferentchak, were charged with designing precisely the object (the median barrier) that plaintiff claims was defective. Defendants here, also unlike the engineer in Ferentchak, had full knowledge of all relevant aspects of the allegedly defective design (as well as, according to Ramisch, all the information necessary to realize that the design would be dangerous if reused). Thus, unlike the engineer in Ferentchak, it was quite possible for defendants, using the degree of care normally employed by engineers, to discover that the design they were submitting was dangerous. Even though defendants’ contract asked them to submit plans only to replace the old bridge deck and median, Ramisch stated that engineers following the standard of care dictated by the contract would have discovered the problems and thus had a duty to go beyond the specifically mentioned task of replacing the bridge deck and to ensure that the replacement was safe. In short, we read the essence of the holding in Ferentchak to be that the engineer there had no knowledge about the defective design and no involvement in creating it. Defendants here had both, and, therefore, Ferentchak is distinguishable. To the extent that Ferentchak stands for the proposition that the tort duties imposed on a defendant pursuant to a contract may not exceed the duties contained in the contract, we do not violate that proposition here. As explained above, we base our holding on the fact that defendants’ contract obligated them to employ a professional standard of care in designing a replacement for the bridge deck, and Ramisch’s affidavit stands as evidence that defendants breached that standard of care by not considering or designing an improved median barrier, even though the improved median barrier was not explicitly mentioned in the contract. Defendants also argue that they cannot be said to have breached any duty under the contract, because WDC accepted their work and the Department “reviewed and approved the plans as complying with all state standards and specifications.” The difficulty with this argument is that the state’s minimum standards and specifications are not necessarily coextensive with the professional standard of care, which may require an engineer to undertake a task not contemplated in the state standards. In fact, plaintiff argues that the Department actually relied on its consultants, such as defendants, to determine what was necessary to ensure a safe new interchange. A violation of the minimum state standards might be strong evidence that defendants breached a duty, but their compliance with state standards does not prove the opposite proposition that they did not breach a duty. Defendants nevertheless continue this argument by asserting that they are protected by the rule that, “[i]n Illinois, an independent contractor or engineer owes no duty to a motorist to utilize his judgment in exercising reasonable care in the design, construction, and installation of roadway features when the State of Illinois’ specifications are not so obviously dangerous that no competent engineer would follow them.” Defendant draws this rule from the supreme court’s decision in Hunt v. Blasius, 74 Ill. 2d 203, 209 (1978), which sets out the rule in roughly equivalent language (although it does not use the term “engineer”). However, even if the rule from Hunt were to apply, we cannot say at this stage of the proceedings that it shields defendants, because the exception to the Hunt rule — as defendants put it, an independent contractor cannot follow others’ designs when “they are so obviously dangerous that no competent engineer would follow them” — applies to the same extent that defendants breached their professional standard of care as discussed above. That is, the Ramisch affidavit states essentially that a competent engineer would have recognized the danger in replacing the bridge deck as it existed and would not have done so; the affidavit thus causes this case to fall within the exception to the Hunt rule for the same reason that it provides evidence that defendants breached the professional standard of care laid out in the contract. Thus, Hunt does not change our analysis; whether its rule applies or not, defendants may be liable under either it or their contractual duty if they failed to investigate and design a better median barrier when a competent engineer would have done so. Defendants’ final argument is that, even if plaintiffs claim can survive summary judgment on the issues of duty and breach, plaintiff has submitted no evidence to establish that defendants’ negligence was a proximate cause of plaintiff’s injury. The term “proximate cause” describes two distinct concepts: cause in fact and legal cause. Abrams v. City of Chicago, 211 Ill. 2d 251, 258 (2004). Defendants’ conduct will be considered cause in fact of an injury if it was a material element or substantial factor in bringing about the injury, i.e., if, absent the conduct, the injury would not have occurred. Abrams, 211 Ill. 2d at 258. Legal cause, on the other hand, “is largely a question of foreseeability.” Abrams, 211 Ill. 2d at 258. Defendants do not contest that plaintiff has produced sufficient evidence of cause in fact to survive summary judgment; instead, they argue only that plaintiff cannot establish that their alleged breach of duty was a legal cause of the accident. To support their argument, defendants cite the rule distinguishing causation from conditions or occasions: “ ‘[t]he cause of an injury is that which actually produces it, while the occasion is that which provides an opportunity for causal agencies to act.’ ” Thompson v. County of Cook, 154 Ill. 2d 374, 383 (1993), quoting Briske v. Village of Burnham, 379 Ill. 193, 199 (1942). “If a defendant’s negligence does nothing more than furnish a condition by which injury is made possible, that negligence is not the proximate cause of the injury.” Thompson, 154 Ill. 2d at 383. As defendants further note, “[p]roximate cause is also absent where the independent acts of a third person break the causal connection between the alleged original wrong and the injury.” Thompson, 154 Ill. 2d at 383. “When that occurs, the independent act itself becomes a proximate or immediate cause.” Thompson, 154 Ill. 2d at 383. Defendants rely on the above authority to argue that, here, even if the median at the scene of the accident was deficient due to their negligence, the median only furnished a condition that allowed the eastbound car to cause the accident. Thus, defendants argue, the intervening acts of the eastbound driver were the actual cause of plaintiff’s injuries. When they make this argument, defendants overlook an important part of the rule governing this type of case. While it “is correct that one may not recover for an injury from the negligent act of an initial wrongdoer when a new and independent force intervenes breaking the initial causal connection and producing the injury,” “ ‘it is fundamental in the law of negligence that there may be more than one proximate cause of injury [citations], and that one is liable for its negligent conduct whether it contributed in whole or in part to the plaintiffs injury, so long as it was one of the proximate causes of the injury.’ ” Ray v. Cock Robin, Inc., 57 Ill. 2d 19, 23 (1974), quoting Nelson v. Union Wire Rope Corp., 31 Ill. 2d 69, 88 (1964). The key to determining whether an initial wrongdoer’s negligence is a cause of an injury or only furnishes a condition for the injury is whether that defendant “might have reasonably anticipated the intervening efficient cause as a natural and probable result of his own negligence,” or “whether the intervening efficient cause was of a type that a reasonable person would see as a likely result of his conduct.” Abrams, 211 Ill. 2d at 259. Plaintiff presented evidence that defendants should have foreseen that the median they designed would help cause a car to vault into the air and cause an accident: Ramisch opined in his affidavit that defendants “[were] aware, or should have been aware, of the vaulting characteristic of the existing median” and “should have been on notice that the proposed work was dangerous and likely to cause injury.” We therefore reject defendants’ argument that plaintiff failed to adduce sufficient evidence of causation to survive summary judgment. Because we conclude that plaintiff has presented at least enough evidence to create questions of fact regarding defendants’ breach of duty and their causation of plaintiffs injury, we disagree with the trial court’s determination that defendants were entitled to summary judgment on those matters. For the foregoing reasons, we reverse the judgment of the circuit court of Lake County and remand for further proceedings consistent with this opinion. Reversed and remanded. BURKE, J., concurs. This case was fully briefed and ready for disposition on December 19, 2007. The case was assigned to the present panel with the dissenting justice designated as author on July 7, 2008. It was transferred to Justice O’Malley as author on October 2, 2009. Plaintiff also brought claims against several defendants not parties to this appeal: Christie Gordon, Grand Avenue Properties, Inc., Gurnee Mills Limited Partnership, Gurnee Properties Associated Limited Partnership, Western Development Corporation (WDC), The Mills Corporation, The Mills Limited Partnership, Gurnee Mills II LLC, and Gurnee Mills LLC. Ramich’s eligibility to provide expert engineering testimony in this case, even though he is not a licensed engineer in Illinois, has been the subject of lengthy litigation. See Thompson v. Gordon, 349 Ill. App. 3d 923 (2004), vacated & remanded, 212 Ill. 2d 555 (2004); Thompson v. Gordon, 356 Ill. App. 3d 447 (2005) (reconsideration after supreme court remand), aff’d, 221 Ill. 2d 414 (2006) . The previous decisions in this case, from this court and the supreme court, have at least implicitly assumed that, if Ramisch were to be qualified as an expert, his opinions would help determine what the professional standard of care was and whether defendants breached it. In holding that Ramisch’s lack of an engineering license did not preclude him from testifying as an engineering expert, both we and the supreme court noted that the legislature has required licensure as a prerequisite to expert testimony regarding the standard of care applicable to a medical professional but has not done so for testimony on the standard of care applicable to an engineering professional. Thompson, 356 Ill. App. 3d at 460 (“if the legislature wanted to condition any testimony by a professional on whether the individual holds a state license, it could enact a statute setting standards for such expert witnesses, as it has done in cases in which the standard of care applicable to a medical professional is at issue”); Thompson, 221 Ill. 2d at 433-34 (quoting the passage from our opinion). These passages equate the purpose of the engineering expert testimony brought here to establish the engineering standard of care with the purpose of medical expert testimony brought to establish the medical standard of care.