2015 IL App (4th) 140546
NO. 4-14-0546

**FILED**
May 29, 2015
Carla Bender
4th District Appellate
Court, IL

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

| | | |
|---|---|---|
| MICHAEL ESSIG and KAY ESSIG, Individually and as Coadministrators of the Estate of Kathryn Essig, Deceased, | ) ) ) | Appeal from Circuit Court of McLean County |
| Plaintiffs-Appellants, | ) | No. 09L211 |
| v. | ) | |
| ADVOCATE BROMENN MEDICAL CENTER, | ) | Honorable |
| Defendant-Appellee. | ) ) | Paul G. Lawrence, Judge Presiding. |

---

JUSTICE STEIGMANN delivered the judgment of the court, with opinion.
Justice Holder White concurred in the judgment and opinion.
Justice Turner specially concurred, with opinion.

**OPINION**

¶ 1    In March 2009, 24-year-old Kathryn Essig died of a pulmonary thromboembolism due to deep vein thrombosis, which occurred when a piece of a blood clot from her deep veins traveled into her lungs and caused a blockage, leading to her asphyxiation. In October 2009, Kathryn's parents, plaintiffs Michael and Kay Essig, sued Dr. Daniel Lange and Carle Clinic Association, P.C. (Carle), alleging that Lange's negligent attempt to remove a kidney stone from Kathryn in April 2008 was the proximate cause of her death. In June 2010, plaintiffs filed an amended complaint, which added claims of institutional negligence against defendant, Advocate BroMenn Medical Center (BroMenn). In February 2014, the trial court granted BroMenn's motion for summary judgment. In June 2014, the court dismissed the case with prejudice after

plaintiffs reached a settlement agreement with Lange and Carle.

¶ 2     Plaintiffs appeal, arguing that the trial court erred by granting summary judgment in favor of BroMenn as to plaintiffs' claims of institutional negligence.  We disagree and affirm.

¶ 3                              I.  BACKGROUND

¶ 4     The following facts were gleaned from the parties' pleadings, affidavits, depositions, and admissions on file with the trial court.

¶ 5                              A.  The Defendants

¶ 6     Lange is a licensed physician specializing in the field of urology.  In April 2008, Lange was employed by Carle within Carle's clinic system in Bloomington-Normal.  Although an agent of Carle, Lange performed some surgical procedures at BroMenn Regional Medical Center in Normal, Illinois.  (In January 2010, BroMenn Regional Medical Center merged with Advocate Health Care and became known as Advocate BroMenn Medical Center.  We refer to the defendant in this appeal and the physical hospital facility in Normal interchangeably as "BroMenn.")  Plaintiffs do not allege that Lange was an agent of BroMenn during the relevant time period.

¶ 7                              B.  Events Preceding Kathryn's Death

¶ 8     On April 2, 2008, Kathryn went to the emergency room after experiencing lower back pain and blood in her urine.  A computed tomography scan revealed that Kathryn had a left renal calculus (a kidney stone in her left kidney).  Although Lange could not determine the source of Kathryn's pain, he did not believe that this particular stone was the cause.  Later that day, Kathryn met with Lange, who, after a consultation, prescribed her some pain medication and instructed her to return to see him in five days.

¶ 9        On April 7, 2008, Kathryn again met with Lange and agreed to be admitted to BroMenn the next day as an inpatient to undergo a procedure—known as a ureteroscopy—in which a long, thin, flexible scope would be inserted into her urethra and up through her ureter to allow Lange to see the inside of her urinary system. (The ureter is a thin tube that transports urine from the kidney to the bladder.) Lange ordered the ureteroscopy to help him identify the nature of Kathryn's medical problems. Kathryn signed a preprinted form entitled "Acknowledgement of Informed Consent to Operation or Procedure." This form, which bore BroMenn's letterhead, stated, in pertinent part, as follows (italics indicate handwritten portions):

> "1. I hereby request and authorize *Dr. Lange \*\*\** to treat the condition(s) which appear indicated by the diagnostic studies already performed. The procedure to treat my condition is *cystoscopy, bilateral retrograde pyelogram, possible ureteroscopy with possible stone manipulation and possible stent insertion.*
>
> 2. My doctor has explained to me the diagnosis of my condition and the nature and purpose of the procedure for which this consent is given, as well as the risks and complications associated with this procedure. In addition, he/she has advised me of the feasible alternative forms of treatment.
>
> 3. I am aware that during the course of the authorized procedure, unexpected conditions may be revealed that require an extension of the authorized procedure or performance of a procedure different than stated in paragraph #1. I, therefore,

authorize the above named physician and selected assistant(s) to perform such surgical and/or medical procedures as necessary in his/her professional judgment. I am aware that the practice of medicine and surgery is not an exact science, and I acknowledge that no guarantees have been made to me as to the results of the operation or procedure(s)."

¶ 10        On April 8, 2008, Kathryn was placed under general anesthesia in an operating room at BroMenn's facility, where Lange performed the procedure at issue in this case. The only agents of BroMenn present during the procedure were Christine Hammond, a registered nurse, and Susan Spencer, an operating-room technician.

¶ 11        Lange performed the ureteroscopy by first passing the ureteroscope through Kathryn's urethra to the bladder, then from the bladder into Kathryn's left ureter. Finding no kidney stone in Kathryn's left ureter, Lange extended the ureteroscope all the way to the junction of the ureter and Kathryn's left kidney. From prior imaging, Lange knew that a kidney stone was present in Kathryn's left kidney. The ureteroscope was capable of grabbing onto the stone with a "basket" that extended from the end of the scope. Although Lange did not think that this particular stone was the cause of Kathryn's recent pain, he decided that removal of the stone was medically appropriate. Lange grabbed the stone with the basket, intending to pull the stone through the ureter to the bladder, then out of Kathryn's body. However, after Lange grabbed the stone with the basket, the stone became stuck at the junction of the ureter and kidney. The stone was too large to pull through the ureter.

¶ 12        In response to this complication, Lange decided to break up the stone into smaller

- 4 -

fragments. Lange did this by releasing the stone from the basket and operating an electrohydraulic lithotripsy (EHL) machine, which fragmented the stone using shockwaves generated by electricity. After using the EHL machine to break the stone into two pieces, Lange made several unsuccessful attempts to further manipulate the stone fragments or to open the basket to retrieve the fragments. At that same time, Lange noticed that Kathryn's ureter had become torn. Concerned that he might cause further damage to the ureter, Lange discontinued the procedure. In so doing, Lange intentionally left various pieces of equipment inside Kathryn's body so as to avoid further injury to the ureter. Two weeks later, Kathryn underwent an additional surgical procedure to remove the stone pieces and the equipment left behind. Thereafter, Kathryn continued to experience complications resulting from the damage to her left ureter. In the months that followed, Kathryn underwent several additional procedures and surgeries, including removal of her left kidney at the Cleveland Clinic in August 2008.

¶ 13      Kathryn continued to experience pain and complications until March 2009, when she died suddenly as the result of a pulmonary thromboembolism. Specifically, Kathryn's death occurred because a piece of a blood clot, which broke away from a larger blood clot inside a deep vein in Kathryn's leg, was pumped through Kathryn's heart and into the arteries of her lung, causing a blockage that resulted in asphyxia and cardiopulmonary arrest. It was discovered postmortem that Kathryn had suffered from undiagnosed celiac disease during her lifetime, which is associated with chronic inflammation and deep vein thrombosis. One of plaintiffs' expert witnesses, Dr. Peter Green, opined in an affidavit that the injury to Kathryn's ureter during the April 8, 2008, surgery exacerbated the symptoms of her celiac disease and thereby contributed to her death.

¶ 14                                  C.  Plaintiffs' Allegations

¶ 15          Although plaintiffs' claims against Lange and Carle are not at issue in this appeal,

we set forth those claims in detail so as to place plaintiffs' claims against BroMenn into the larger

context of this lawsuit.

¶ 16                                  1.  *Allegations Against Lange and Carle*

¶ 17          Plaintiffs alleged that Lange, and thereby Carle through the doctrine of

*respondeat superior*, negligently (1) performed an invasive surgical procedure on Kathryn that

was not clinically necessary; (2) failed to properly perform that surgery; (3) proceeded with that

surgery knowing that a necessary piece of equipment was unavailable—namely, a holmium

laser—which provides a safer means of fragmenting kidney stones within the body; (4)

performed EHL upon Kathryn in the absence of Kathryn's informed consent; (5) caused a tear in

Kathryn's ureter; (6) failed to timely recognize and treat that tear; (7) caused or contributed to the

obliteration of Kathryn's ureter; (8) failed to properly manage Kathryn's postsurgical condition;

(9) failed to timely, properly, and adequately inform Kathryn of the cause and extent of the

injury to her ureter; (10) failed to fully inform Kathryn of the consequences and complications of

her care, including that she had suffered an accidental injury during the surgical procedure,

which caused urine to leak outside of her urological system; and (11) failed to afford Kathryn her

rights under the Medical Patient Rights Act (410 ILCS 50/0.01 to 99 (West 2008)).

¶ 18                                  2.  *Allegations Against BroMenn*

¶ 19          Plaintiffs' claims against BroMenn were not based not upon *respondeat superior*,

but instead, institutional negligence, under which "[l]iability is predicated on the hospital's own

negligence, not the negligence of the physician."  *Jones v. Chicago HMO Ltd. of Illinois*, 191 Ill.

2d 278, 292, 730 N.E.2d 1119, 1128 (2000). Plaintiffs' complaint set forth 13 specific allegations of institutional negligence against BroMenn, which—taken together—generally alleged that BroMenn committed institutional negligence by (1) permitting Lange to perform unnecessary procedures upon Kathryn (specifically, the ureteroscopy and EHL procedure); (2) failing to properly obtain informed consent from Kathryn; (3) improperly credentialing Lange, particularly as to the use of EHL; and (4) failing to provide Lange with the necessary equipment, namely a holmium laser.

¶ 20      Pursuant to section 2-622(a)(1) of the Code of Civil Procedure (735 ILCS 5/2-622(a)(1) (West 2008)), plaintiffs attached to their complaint a physician's written report attesting to the merits of their claims. In that report, Dr. Jay Copeland, a Maryland physician who specialized in urology, provided the following opinions regarding BroMenn's liability:

> "It is my medical opinion there was no need to proceed with
> ureteroscopy on [Kathryn], considering the signs, symptoms, and
> radiology findings prior to the performance of the procedure. ***
> In my opinion, BroMenn allowed Dr. Lange to proceed with
> performing [EHL] upon the patient without first obtaining the
> patient's informed consent, and without the patient authorizing
> such procedure. BroMenn failed to disclose to [Kathryn] the
> potential risks of using the EHL machine and specifically failed to
> disclose the high complication rates that such equipment carries
> when utilized within the ureter in close proximity to the ureteral
> tissue. ***

- 7 -

In my opinion, BroMenn deviated from the medical standard of care by allowing the patient to undergo a surgical procedure without first obtaining the patient's informed consent.

\*\*\*

I believe BroMenn should have had a Holmium laser available for Dr. Lange if it was his expectation that such equipment was needed for treatment of the patient's medical problem. \*\*\*

I believe BroMenn was negligent by failing to adequately monitor Dr. Lange, failing to provide him with training in the use of the EHL machine, and failing to assure that he would provide medical care and services that met the applicable standard of care. I believe BroMenn was negligent by failing to properly credential Dr. Lange and failing to train him in the proper use of its EHL machine. It would appear from a review of the medical records and from Dr. Lange's deposition that he should not have been credentialed to perform such a procedure upon the patient, under the applicable circumstances."

¶ 21                                    D.  Lange's Admissions

¶ 22        In response to plaintiffs' written interrogatories, Lange provided the following pertinent facts: (1) Lange told Kathryn before the April 8, 2008, procedure that he would attempt to manipulate the kidney stone, if possible; (2) the stone's becoming stuck at the junction of the

kidney and ureter was an unexpected condition of the surgery; (3) it was Lange's professional judgment that the stone's becoming stuck necessitated the use of EHL; (4) Lange had previously used EHL equipment in postresidency practice and believed he did not require any additional training; (5) Lange was aware that damage to the ureter was a potential complication of EHL; and (6) pursuant to an agreement with BroMenn, a third-party provider could have provided a holmium laser for the April 8, 2008, procedure if Lange had so requested in advance.

¶ 23                                E.  The Experts

¶ 24                                1.  *Plaintiffs' Experts*

¶ 25         Plaintiffs retained three expert witnesses: Jay Copeland, M.D.; Peter Green, M.D.; and Lawrence Hatchett, M.D.  Among those three experts, however, only Copeland claimed to have any opinion as to whether BroMenn was in any way negligent.  Green and Hatchett both explicitly stated that they had no opinion as to whether BroMenn or any of its agents breached any applicable standard of care.  Accordingly, we summarize only Copeland's opinions.

¶ 26         At an August 2012 deposition, Copeland testified that the task of obtaining informed consent is "purely a function of a physician," who usually obtains informed consent from the patient in an office setting without hospital personnel present.  Copeland also testified that it is sometimes permissible, and within the standard of care, for a physician to respond to an unexpected complication of surgery by performing an additional procedure that was not discussed with the patient ahead of time.

¶ 27         Copeland acknowledged that circumstances exist in which the use of EHL falls within the standard of care—namely, when used to fragment a stone in the bladder.  Copeland believed that Lange's use of EHL to fragment a stone in the ureter was a breach of the standard

of care. When asked to explain how he believed BroMenn "permitted" Lange to use EHL upon Kathryn in an inappropriate manner, Copeland suggested that the BroMenn nurse who was present during the procedure should have "questioned" Lange's use of EHL because (1) EHL was not listed on the "operative permit" and (2) the nurse should have known that Lange's intended use of EHL was not appropriate under the circumstances. In somewhat of a contradiction, however, Copeland also stated that (1) the stone becoming stuck at the junction of Kathryn's ureter was an unexpected complication of the procedure and (2) the manner of dealing with an unexpected complication is a surgical decision, not a nursing decision.

¶ 28        Copeland also agreed that Lange had been trained in the use of EHL, but Copeland did not know the nature or extent of that training. Despite statements Copeland made in his section 2-622 report, he actually did not know anything about the credentials or privileges BroMenn provided to Lange regarding the use of EHL. The following exchange occurred between Copeland and counsel for Lange and Carle:

"[COUNSEL]: You talk about that Dr. Lange was improperly credentialed and BroMenn should not have credentialed him to use EHL. What's your basis for that opinion?

[COPELAND]: *** I think using EHL in a proper way such as in the bladder is what its current use is. And unfortunately *** I don't know enough about BroMenn's credentialing because there was a problem one way or the other, *** either Dr. Lange was not credentialed to use it for renal or ureteral calculi [(stones in the kidney or ureter)]. And if he wasn't, he used it, which is a

- 10 -

breach of the standard of care.  ***

The other way, he was credentialed by BroMenn to use it in the ureter and in the kidney, which is not right.  ***

[COUNSEL]:  Okay.  Is it common for you to offer opinions with regard to whether a doctor was improperly credentialed by a hospital even though you don't know anything about exactly what those credentials are and what that credentialing process was?

[COPELAND]:  I guess as a specific statement no, but there's the problem with the peer review where we know that Dr. Lange has had multiple peer reviews ***. *** [E]ither Dr. Lange wasn't credentialed or was improperly credentialed.  And if he was not credentialed, then it's the hospital mechanism failing to keep him from using the EHL in an improper way."

Copeland then explained that his concerns over Lange's credentials arose from a November 2009 letter to Lange from BroMenn's president, Alan Ginzburg, regarding peer review of Lange's past cases.  That letter, which is included in the record, reads in its entirety as follows:

"Dear Dr. Lange,

As you know, the medical staff is responsible for peer review and assurance of quality care at BroMenn.  Over the past few years, several of your cases have been the subject of peer review.

- 11 -

I am happy to report, however[,] that none of the reviews

raised questions or concerns regarding your surgical skills,

judgment, or medical care.  Therefore, this letter is to affirm that

your urology privileges at BroMenn are full and unrestricted at this

time."

After reading Ginzburg's letter aloud at his deposition, Copeland stated, "I imply from that that there have been questions about cases Dr. Lange has done.  I know nothing further than that."

¶ 29                                    2. *BroMenn's Experts*

¶ 30          In support of its motion for summary judgment, BroMenn submitted the affidavit of Kelly Cone, a registered nurse who stated that she was familiar with "standards of care for hospital personnel such as nurses and certified nursing technicians in the surgical environment and, in particular, in the environment of assisting physicians with the urological procedures such as occurred in the matter that is in litigation in this case."

¶ 31          Cone explained why the standard of care would not require the nurse or surgical technician to intervene when Lange decided to use EHL:

"[A] reasonably well-qualified nurse or certified surgical

technician would not know whether EHL was or was not an

appropriate modality of treatment in the situation that allegedly

presented to Dr. Lange[,] as that is not in their scope of practice.  A

decision of that nature is considered the practice of medicine and is

not an area in which a reasonably well-qualified nurse or certified

surgical technician is educated—hence it was not contrary to the

- 12 -

standard of care to not attempt to intervene in some fashion when

Dr. Lange chose that modality of treatment to attempt to alleviate

the problem that he perceived he was facing."

Cone went on to explain that virtually all of Lange's allegedly negligent decisions regarding the

April 8, 2008, procedure were medical decisions and therefore outside the scope of practice of a

nurse or surgical technician. (We note that Hammond and Spencer, the registered nurse and

operating-room technician present during the April 8, 2008, procedure, are the only BroMenn

personnel who plaintiffs have alleged were involved in Lange's treatment of Kathryn.)

¶ 32                                    F.  Summary Judgment

¶ 33          In December 2013, BroMenn moved for summary judgment.  In February 2014,

after briefing and a hearing (the transcript of which is not included in the record on appeal), the

trial court granted summary judgment for BroMenn.  In a written order, the court found that (1)

no triable issues of fact existed between plaintiffs and BroMenn, and (2) "the alleged negligent

acts [were] not the proximate cause of plaintiffs' alleged damages."  In June 2014, after plaintiffs

reached a settlement agreement with Lange and Carle, the court dismissed the action with

prejudice.

¶ 34          This appeal followed.

¶ 35                                    II.  ANALYSIS

¶ 36          On appeal, plaintiffs argue that the trial court erred by granting summary

judgment in favor of BroMenn as to plaintiffs' claims of institutional negligence.  We disagree.

¶ 37               A.  Summary Judgment and the Standard of Review

¶ 38          "The purpose of a summary-judgment proceeding is not to try an issue of fact but,

- 13 -

instead, to determine whether a genuine issue of material fact exists." *Evans v. Brown*, 399 Ill. App. 3d 238, 243, 925 N.E.2d 1265, 1270 (2010). Summary judgment is appropriate only "if the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." 735 ILCS 5/2-1005(c) (West 2012). "In order to survive a motion for summary judgment, a plaintiff need not prove her case, but she must present a factual basis that would arguably entitle her to a judgment." *Bruns v. City of Centralia*, 2014 IL 116998, ¶ 12, 21 N.E.3d 684. "If the plaintiff fails to establish any element of the cause of action, summary judgment for the defendant is proper." *Williams v. Manchester*, 228 Ill. 2d 404, 417, 888 N.E.2d 1, 9 (2008).

¶ 39        We review a trial court's entry of summary judgment *de novo*. *Standard Mutual Insurance Co. v. Lay*, 2013 IL 114617, ¶ 15, 989 N.E.2d 591. Before turning to plaintiffs' claims and the trial court's judgment in this case, however, we must address evidentiary issues that have come to light on appeal.

¶ 40                    B. Plaintiffs' Reliance Upon Improper Evidence

¶ 41        Throughout this litigation, plaintiffs' arguments against summary judgment have been based primarily upon evidence that was not properly before either the trial court or this court when determining whether summary judgment was appropriate. Specifically, plaintiffs have relied mostly on the opinions in Copeland's written report, which plaintiffs filed along with their complaint pursuant to section 2-622(a)(1) of the Code. Indeed, Copeland's section 2-622 report is by far the most heavily cited item in the record. (The report is literally "Exhibit A" of plaintiffs' memorandum in opposition to BroMenn's motion for summary judgment.) However,

- 14 -

plaintiffs' reliance on Copeland's report is entirely inappropriate for purposes of summary judgment.

¶ 42    Section 2-622(a)(1) of the Code provides, in pertinent part, as follows:

"(a) In any action *** in which the plaintiff seeks damages for injuries or death by reason of medical, hospital, or other healing art malpractice, the plaintiff's attorney *** shall file an affidavit, attached to the original and all copies of the complaint, declaring one of the following:

1. That the affiant has consulted and reviewed the facts of the case with a health professional ***; that the reviewing health professional has determined in a written report *** that there is a reasonable and meritorious cause for the filing of such action ***. *** A copy of the written report, clearly identifying the plaintiff and the reasons for the reviewing health professional's determination that a reasonable and meritorious cause for the filing of the action exists, *** must be attached to the affidavit." 735 ILCS 5/2-622(a)(1) (West 2008).

¶ 43    Copeland's written report in this case, although sufficient for purposes of section 2-622 of the Code, was entirely insufficient for the purpose of opposing BroMenn's motion for summary judgment. The most obvious fatal deficiency is that Copeland's written report was not an affidavit, meaning it was not sworn to, notarized, or otherwise made under oath. See *Roth v.*

- 15 -

*Illinois Farmers Insurance Co.*, 202 Ill. 2d 490, 494, 782 N.E.2d 212, 214 (2002) ("[A]n affidavit must be sworn to, and statements in a writing not sworn to before an authorized person cannot be considered affidavits."). Section 2-1005(c) of the Code requires the trial court to make its summary judgment determination based upon "the pleadings, depositions, and admissions on file, together with the affidavits." 735 ILCS 5/2-1005(c) (West 2012). Unsworn statements of opinion from a party's retained expert may not be considered for purposes of section 2-1005(c) of the Code.

¶ 44    At oral argument in this appeal, plaintiffs' counsel asserted that Copeland's section 2-622 report should be considered a "sworn" document because Copeland subsequently "incorporated" the report into a November 2013 affidavit. We disagree. Copeland prepared two section 2-622 reports in this case: one discussing the cause of action against Lange and Carle and one discussing the cause of action against BroMenn. In Copeland's November 2013 affidavit, executed more than 3 1/2 years after he prepared his section 2-622 reports, Copeland purported to incorporate only a single report, stating, "I have prepared *a* written report in this matter, attached hereto and incorporated herein as part of this affidavit." (Emphasis added.) Although neither report was actually attached to the affidavit and Copeland did not specify which of the two reports he was attempting to incorporate, we note that the November 2013 affidavit was filed in response to *Lange and Carle's* motion for summary judgment. Copeland signed his affidavit the same day that plaintiffs' counsel signed his response to Lange and Carle's motion for summary judgment (November 19, 2013), and both documents were filed together the following day. Copeland's November 2013 affidavit said nothing about BroMenn or institutional negligence, but instead, concluded with the following statement: "[I]t is my opinion *** that the

iatrogenic injuries and their *sequelae* suffered by [Kathryn] *** are the type of injuries that a reasonably well qualified physician and surgeon would anticipate as a likely result of substandard medical care in the performance of urologic surgery."  Last, plaintiffs did not include this affidavit in the materials they submitted in response to BroMenn's motion for summary judgment.  It is obvious to us that Copeland—even if he can be said to have "incorporated" his earlier unsworn statements into a sworn affidavit—incorporated only the section 2-622 report pertaining to Lange and Carle.  We reject counsel's assertion that Copeland's section 2-622 report pertaining to BroMenn should be considered an affidavit.

¶ 45        In any event, when a party offers expert opinions in written form at the summary judgment stage, the writing must not only be sworn (*i.e.*, an affidavit), but must also comply with Illinois Supreme Court Rule 191(a) (eff. July 1, 2002), which provides, in pertinent part, as follows:

> "Affidavits in support of and in opposition to a motion for
> summary judgment under section 2-1005 of the Code of Civil
> Procedure *** shall be made on the personal knowledge of the
> affiants; shall set forth with particularity the facts upon which the
> claim, counterclaim, or defense is based; shall have attached
> thereto sworn or certified copies of all papers upon which the
> affiant relies; shall not consist of conclusions but of facts
> admissible in evidence; and shall affirmatively show that the
> affiant, if sworn as a witness, can testify competently thereto."

¶ 46        The requirements of Rule 191(a) are based on the recognition that "[a]n affidavit

submitted in the summary judgment context serves as a substitute for testimony at trial."
*Robidoux v. Oliphant*, 201 Ill. 2d 324, 335, 775 N.E.2d 987, 994 (2002).  At trial, an expert may give an opinion without first disclosing the facts underlying that opinion (*Wilson v. Clark*, 84 Ill. 2d 186, 194, 417 N.E.2d 1322, 1326 (1981)) because the opposing party has the opportunity to cross-examine the expert as to the basis of his opinion.  *Robidoux*, 201 Ill. 2d at 334, 775 N.E.2d at 993.  However, because the opportunity to cross-examine is not present when a party submits written opinions in the summary judgment context, Rule 191(a) essentially requires the affiant to provide his own cross-examination regarding the factual bases for his opinions.  *Id*. at 338, 775 N.E.2d at 995 ("Given that cross-examination is unavailable as a means to test an affidavit, it is not surprising that the standard for admission of an affidavit in a summary judgment context would be higher than for the admission of an expert's opinion at trial.").

¶ 47        Copeland's section 2-622 report failed almost entirely to comply with the requirements of Rule 191(a).  Copeland based much of his conclusory opinions on facts upon which he had no personal knowledge, he failed to set forth with particularity the facts upon which he based his opinions, and he failed to attach to his report the documents upon which he relied.  Because affidavits in summary judgment proceedings are substitutes for trial testimony, "it is necessary that there be strict compliance with Rule 191(a) 'to insure that trial judges are presented with valid evidentiary facts upon which to base a decision.' "  *Id*. at 336, 775 N.E.2d at 994 (quoting *Solon v. Godbole*, 163 Ill. App. 3d 845, 851, 516 N.E.2d 1045, 1049 (1987)).

¶ 48        The facts of this case acutely illustrate the purpose behind Rule 191(a).  At Copeland's deposition, when defense counsel asked Copeland about certain opinions he included in his section 2-622 report, the following exchange occurred:

"[COUNSEL]: [Y]ou talk about, 'BroMenn failed to properly inform the patient that the urological basket was stuck in the patient's left ureter and failed to clearly and plainly explain to the patient that she had suffered an injury during the procedure on April 8, 2008, at BroMenn.' That's your opinion?

[COPELAND]: Yes.

[COUNSEL]: So are you saying that neither [Kathryn] nor her family were ever informed that the basket was stuck and that she suffered an injury during the procedure on April 8, 2008, at BroMenn?

[COPELAND]: I'm not clear what was explained to them. Obviously [Kathryn] is dead and I don't know specifically what her parents said.

[COUNSEL]: Why did you offer that opinion if you don't really know what was informed as to the patient?

[COPELAND]: Because I was told that they didn't know.

[COUNSEL]: Who told you that?

[COPELAND]: Dr. Pliura [(plaintiffs' counsel)].

[COUNSEL]: Is it normal for you to rely upon the statements of the advocate for one side or the other as your basis for an opinion in a medical malpractice case?

[COPELAND]: If I don't have that information myself."

- 19 -

¶ 49        As the above exchange illustrates, at least some of the opinions in Copeland's section 2-622 report had no valid evidentiary basis because they were based on nothing more than the representations of plaintiffs' attorney, Thomas Pliura.  Copeland therefore could not have competently testified as to such opinions at trial.  Opinions that are inadmissible at trial cannot be used in opposition to a motion for summary judgment.  If the rule were otherwise, the motion for summary judgment might be denied based upon such an inadmissible opinion, only to have the case then proceed to trial (with all the expenses and resources that would entail), at which the opinion might still be inadmissible.  This is exactly why Rule 191(a) requires an expert to demonstrate that his opinion would be admissible at trial by setting forth the particular facts upon which he relied in reaching his opinion, and to attach to his affidavit the documents upon which he relied.  Were we to give Copeland's report any evidentiary weight for purposes of summary judgment, we would be allowing plaintiffs to use unsupported, bare conclusions from an expert as " 'a free pass to trial.' "  *Id.* at 337, 775 N.E.2d at 994 (quoting *Hayes v. Douglas Dynamics, Inc.*, 8 F.3d 88, 92 (1st Cir. 1993)).  Accordingly, plaintiffs' reliance on Copeland's section 2-622 report in opposition to summary judgment is improper.  See *Forsberg v. Edward Hospital & Health Services*, 389 Ill. App. 3d 434, 440, 906 N.E.2d 729, 734 (2009) (holding that the expert's section 2-622 report in that case, even if sufficient to be considered an affidavit, was nonetheless inadmissible in opposition to the defendant's motion for summary judgment because it failed to comply with Rule 191(a)).

¶ 50        Copeland's written report is not the only piece of improper evidence upon which plaintiffs have relied in the trial court and on appeal.  In their brief to this court, for example, plaintiffs assert that EHL "carries the highest complication rate" and "should not be available as

an option for use in a hospital or surgery center."  In support of these assertions, however, plaintiffs cite an unsworn, unsigned, 22-page document in the record that appears to consist of (1) text that has been copied from a medical record in Kathryn's case and (2) intermittent commentary, written in the first person, critiquing Lange and BroMenn.  Remarkably, although the author of the commentary is not even identified in the document, plaintiffs have relied upon this commentary in the factual statement and argument section of their appellate brief.

¶ 51        Elsewhere in their brief to this court, plaintiffs rely upon purported conclusions and opinions contained in *plaintiffs'* discovery disclosures filed pursuant to Illinois Supreme Court Rule 213(f)(3) (eff. Jan. 1, 2007).  Rule 213(f)(3) provides, in pertinent part, that "[u]pon written interrogatory, a *party* must furnish the identities and addresses of witnesses who will testify at trial" and, for controlled expert witnesses, "identify: (i) the subject matter on which the witness will testify; (ii) the conclusions and opinions of the witness and the bases therefor; (iii) the qualifications of the witness; and (iv) any reports prepared by the witness about the case." (Emphasis added.) Ill. S. Ct. R. 213(f)(3) (eff. Jan. 1, 2007).  The purpose of this rule "is to prevent unfair surprise at trial, without creating an undue burden on the parties before trial."  Ill. S. Ct. R. 213, Committee Comments (adopted Mar. 28, 2002).  However, the contents of Rule 213(f) disclosures are not *evidence* for purposes of summary judgment because Rule 213(f) disclosures are not pleadings, depositions, admissions, or affidavits.  735 ILCS 5/2-1005(c) (West 2012).

¶ 52        Notably, Rule 213(f) requires the *party*—not the expert himself—to disclose the substance of the expert's anticipated testimony.  The disclosures plaintiffs rely upon in this case were written and signed by plaintiffs' counsel, Pliura, and are unsworn.  Pliura merely sets forth

in the disclosures how he *anticipates* his retained experts will testify. We need look no further than the strict requirements of Rule 191(a)—which apply even when an expert sets forth his opinions in his own affidavit (*Robidoux*, 201 Ill. 2d at 337, 775 N.E.2d at 995)—to understand why Pliura's Rule 213(f) disclosures cannot possibly be considered admissible as evidence of his expert witnesses' opinions for purposes of summary judgment. In fact, we note that the Rule 213(f) disclosure that plaintiffs rely upon in arguing that Lange's procedure contributed to Kathryn's death consists mostly of information that Pliura apparently copied from online medical websites and pasted into the disclosure document. (We infer that Pliura copied this information directly from websites because the disclosure document includes multiple different font sizes and styles, website graphics, and metadata throughout.)

¶ 53        We have chosen to discuss plaintiffs' reliance upon improper evidence at length because, for reasons that are not entirely clear, BroMenn has not. As far as the record reveals, BroMenn has at no point during this litigation objected—or even drawn the court's attention to—plaintiffs' improper reliance upon Copeland's section 2-622 report, the Rule 213(f) disclosures, or any other inadmissible evidence for purposes of the summary judgment determination. In its written order, the trial court did not reveal how it dealt with the improper evidence for purposes of summary judgment—whether it gave full consideration to it or disregarded it in its entirety.

¶ 54        However, on review of a trial court's summary judgment determination, we are to perform the appropriate analysis *de novo*, without deferring to the trial court's judgment or reasoning. *Bank of America, N.A. v. Adeyiga*, 2014 IL App (1st) 131252, ¶ 56, 29 N.E.3d 60. Indeed, even in the absence of an objection, the appropriate summary judgment analysis usually requires the court to first identify the evidence that should be considered. In other words, the

court cannot determine whether the "the pleadings, depositions, and admissions on file, together with the affidavits" (735 ILCS 5/2-1005(c) (West 2012)) reveal a genuine issue of material fact without first distinguishing the pleadings, depositions, admissions on file, and affidavits from the rest of the various documents and filings in the record.

¶ 55    Further, although we have already concluded in this case that Copeland's section 2-622 report is *not* an affidavit, we note that courts of review have deemed it appropriate to *sua sponte* determine the sufficiency of affidavits on *de novo* review of a trial court's summary judgment ruling.  In *Fabiano v. City of Palos Hills*, 336 Ill. App. 3d 635, 784 N.E.2d 258 (2002), the court stated the general rule:

> " 'Although the court at the summary judgment stage does not try the issues, evidence that would be inadmissible at trial *may not* be considered in support of or in opposition to a motion for summary judgment.  [Citation.]  Accordingly, the trial court *must* consider and decide whether the affidavits and attachments that purport to create a genuine issue of material fact would be admissible evidentiary matter at a trial on the merits.' " (Emphases added.)  *Id*. at 648, 784 N.E.2d at 271 (quoting *Safeway Insurance Co. v. Hister*, 304 Ill. App. 3d 687, 691, 710 N.E.2d 48, 51 (1999)).

In *Fabiano*, the trial court failed to rule on the admissibility of evidence offered at the summary judgment stage, even though both parties had raised objections.  *Id.*  On appeal, the First District concluded that although "the trial judge failed to make the required evidentiary rulings in this

case" and "neither party filed a written motion to strike affidavits submitted by the other, the absence of such a motion does not preclude this court's *de novo* review of the sufficiency of those affidavits." *Id*.

¶ 56  One year prior to *Fabiano*, in *Jackson v. Graham*, 323 Ill. App. 3d 766, 774, 753 N.E.2d 525, 532 (2001), this court held that (1) *de novo* review applies to the trial court's striking of an affidavit in conjunction with a summary judgment ruling and (2) the trial court can—and should—*sua sponte* strike affidavits that are insufficient under Rule 191(a).

¶ 57  In this case, BroMenn's failure to object to plaintiffs' reliance upon improper evidence does not require this court to consider that improper evidence for purposes of summary judgment. As we have often stated, "forfeiture is a limitation on the parties and not on this court, which has a responsibility to achieve a just result and maintain a sound and uniform body of precedent." *Roxana Community Unit School District No. 1 v. Environmental Protection Agency*, 2013 IL App (4th) 120825, ¶ 39, 998 N.E.2d 961. Accordingly, we turn now to whether the "the pleadings, depositions, and admissions on file, together with the affidavits" (735 ILCS 5/2-1005(c) (West 2012)), provide a factual basis for plaintiffs' claims against BroMenn. Because we decline to consider the improper evidence in making our determination, our analysis is relatively straightforward.

¶ 58       C. Plaintiffs' Claims Against BroMenn

¶ 59  Plaintiffs' institutional-negligence claims against BroMenn can be divided into four general categories: (1) credentialing of Lange; (2) permitting Lange to perform the specific procedure at issue in this case; (3) lack of informed consent; and (4) failure to make available a holmium laser.

- 24 -

¶ 60    The tort of institutional negligence, also known as direct corporate negligence, treats the hospital itself as the alleged tortfeasor.  Under this tort theory, "a defendant hospital is judged against what a reasonably careful hospital would do under the same circumstances." *Longnecker v. Loyola University Medical Center*, 383 Ill. App. 3d 874, 885, 891 N.E.2d 954, 963 (2008) (citing Illinois Pattern Jury Instructions, Civil, No. 105.03.01 (1995)).  Ordinarily, the hospital's institutional duty of care is "administrative or managerial in character."  *Jones*, 191 Ill. 2d at 291, 730 N.E.2d at 1128.

¶ 61    In *Jones*, the supreme court explained the principles underlying the tort of institutional negligence:

"Underlying the tort of institutional negligence is a recognition of the comprehensive nature of hospital operations today.  The hospital's expanded role in providing health care services to patients brings with it increased corporate responsibilities.  As *Darling* [*v. Charleston Community Memorial Hospital*, 33 Ill. 2d 326, 332, 211 N.E.2d 253, 257 (1965)], explained: 'Present-day hospitals, as their manner of operation plainly demonstrates, do far more than furnish facilities for treatment.  They regularly employ on a salary basis a large staff of physicians, nurses[,] and intern[s], as well as administrative and manual workers, and they charge patients for medical care and treatment, collecting for such services, if necessary, by legal action.'  [Citation.]  *** [I]n recognizing hospital institutional

- 25 -

negligence as a cause of action, *Darling* merely applied principles

of common law negligence to hospitals in a manner that comports

with the true scope of their operations. [Citation.]" *Id.* at 292, 730

N.E.2d at 1128.

With these legal principles in mind, we turn now to plaintiffs' specific claims.

¶ 62                                    1. *Credentialing of Lange*

¶ 63          In *Frigo v. Silver Cross Hospital & Medical Center*, 377 Ill. App. 3d 43, 72, 876

N.E.2d 697, 723 (2007),  the First District laid out the elements of proof required when a

plaintiff's claims of institutional negligence are premised upon the defendant hospital's negligent

credentialing of a treating physician:

> "First, to prevail, the plaintiff must prove the hospital failed to
>
> meet the standard of reasonable care in the selection of the
>
> physician it granted medical staff privileges to whose treatment
>
> provided the basis for the underlying medical malpractice claim.
>
> Hospitals are required to exercise reasonable care in the granting of
>
> medical staff privileges.  'Reasonable care' means that degree of
>
> care, skill and judgment usually exercised under like or similar
>
> circumstances by the average hospital.  Expert testimony is
>
> required to prove the applicable standard of care and whether that
>
> standard was violated.
>
>          Second, the plaintiff must prove that, while practicing
>
> pursuant to negligently granted medical staff privileges, the

physician breached the applicable standard of care. Finally, the plaintiff must prove that the negligent granting of medical staff privileges was a proximate cause of the plaintiff's injuries."

¶ 64     In this case, plaintiffs alleged in their first amended complaint that BroMenn committed institutional negligence by (1) "failing to properly credential, supervise, monitor[,] and review the care and treatment by Dr. Lange so as to protect patients of [BroMenn], including [Kathryn], from unsafe and unnecessary care"; (2) "permitting and credentialing Dr. Lange to use [BroMenn's EHL] equipment in the care and treatment of [BroMenn's] patients, including [Kathryn], when [BroMenn] knew or should have known that Dr. Lange had not been adequately trained in the proper use and clinical appropriateness of the equipment"; and (3) "permitting and credentialing Dr. Lange to practice at [BroMenn] when [BroMenn] knew or should have known that Dr. Lange was unqualified, negligent, and/or otherwise unsuitable to exercise the privileges granted."

¶ 65     Initially, we note that plaintiffs have not even attempted to argue on appeal that BroMenn knew or should have known Lange (1) had not been adequately trained in the proper use and clinical appropriateness of EHL or (2) was unqualified, negligent, and/or otherwise unsuitable to exercise the privileges granted. (Plaintiffs have likely not made these arguments because the record contains no evidence whatsoever to support them.) Plaintiffs have offered no evidence pertaining to Lange's performance history, peer-review assessments, or any other such information that BroMenn allegedly had—or should have had—which would have put them on notice of Lange's allegedly negligent treatment of patients.

¶ 66     In support of their conclusory contention that BroMenn negligently credentialed

Lange, plaintiffs rely exclusively upon Copeland's (1) section 2-622 report and (2) deposition testimony. As already stated, we will not consider the unsworn, unsupported opinions contained in Copeland's section 2-622 report for purposes of our summary judgment determination. As to Copeland's deposition testimony, plaintiffs' argument on appeal consists merely of a citation to a portion of the deposition transcript that they assert contains "a lengthy discussion on the issue of negligent credentialing." We have thoroughly reviewed that portion of the transcript and, although it does include a discussion about credentialing, it actually reveals that Copeland knew nothing about BroMenn's credentialing of Lange, much less whether it was negligent. In fact, Copeland admitted, "I don't know enough about BroMenn's credentialing." Simply put, nothing in the record provides any factual support for plaintiffs' claims regarding BroMenn's alleged negligent credentialing of Lange. Accordingly, the trial court properly granted summary judgment for BroMenn as to those claims.

¶ 67                    2. *Permitting the Specific Procedure at Issue*

¶ 68          Plaintiffs also alleged in their complaint that BroMenn committed institutional negligence by permitting Lange to perform a ureteroscopy and EHL upon Kathryn "when [BroMenn], through its agents, employees, and servants knew or should have known that such procedure[s were] not clinically indicated or otherwise necessary." In support of this claim, plaintiffs rely exclusively upon Copeland's section 2-622 report. However, not only is Copeland's report not properly before the court (as we have already explained), it does not even support plaintiffs' claim.

¶ 69          Citing to the first page of Copeland's section 2-622 report, plaintiffs assert in their brief on appeal that "Copeland is of the opinion that permitting a surgeon to perform unnecessary

- 28 -

procedures violates the hospital's standard of care."  We have reviewed the cited portion of Copeland's report and find no such opinion contained therein.  (In fact, the term "standard of care" appears nowhere on the cited page.)  Copeland does state, "[i]n my opinion, BroMenn allowed Dr. Lange to proceed with a surgical procedure on [Kathryn] when said procedure was not clinically indicated or necessary."  But this statement reveals nothing about the standard of care applicable to a claim of institutional negligence.  As the supreme court has explained, a hospital's duty of care under the tort of institutional negligence is ordinarily "administrative or managerial in character."  *Jones*, 191 Ill. 2d at 291, 730 N.E.2d at 1128.  If simply "allowing" a physician to perform procedures on its premises renders a hospital institutionally liable whenever that physician commits malpractice, then the tort of institutional negligence would be rendered a tort of strict liability.

¶ 70　　　　　　Plaintiffs have offered no evidence that any agent, employee, or servant of BroMenn knew or should have known that a ureteroscopy or EHL were not clinically indicated or necessary.  Although plaintiffs have never expressly stated what they believe BroMenn should have done differently in this case, the only logical inference from their argument is that BroMenn should have appointed some type of agent—presumably, a fully trained and licensed urologist— to oversee Lange's treatment of Kathryn and to veto the allegedly negligent course of treatment that Lange chose to undertake.  Under plaintiffs' theory of liability, we can think of no other way for a hospital to ensure that a physician practicing on its premises does not perform a procedure that is "not clinically indicated or necessary."  Of course, the law does not impose such a duty on hospitals.  See *Alford v. Phipps*, 169 Ill. App. 3d 845, 857-58, 523 N.E.2d 563, 571 (1988) ("As a general rule, the decision to treat a patient in a particular matter is a medical question entirely

within the discretion of the treating physician, not the hospital [citation], and traditionally it has been held that a hospital is not liable for acts of one who renders medical care as an independent agent outside the control of the hospital [citation]."); see also *Pickle v. Curns*, 106 Ill. App. 3d 734, 739, 435 N.E.2d 877, 881-82 (1982) ("We do not recognize the existence of a duty on the part of the hospital's administration to insure that each of its staff physicians will always perform his duty of due care to his patient.  [Citation.] *** '[A] hospital will not be held liable for an act of malpractice performed by an independently retained healer, unless it had reason to know the act of malpractice would take place ***.' " (quoting *Fiorentino v. Wenger*, 19 N.Y.2d 407, 414 (1967))).

¶ 71        In this case, the record contains no evidence that BroMenn knew or should have known that Lange was anything less than fully qualified to treat patients in accordance with the applicable standard of medical care.  Although Copeland briefly suggested at his August 2012 deposition that the BroMenn nurse present during the April 8, 2008, procedure should have "questioned" Lange's decision to use EHL (whatever that means), Copeland also testified that the manner of dealing with an unexpected complication of surgery "is a surgical decision, not a nursing decision."  Moreover, Cone—a registered nurse—testified in her affidavit that it would be entirely inconsistent with both the scope of nursing practice and the applicable standard of care for an attending nurse to attempt to interfere with a surgeon, *in the midst of an ongoing surgery*, from doing what the surgeon deemed medically necessary to address an unexpected complication.  The record before us presents no genuine issue of material fact to warrant a trial on plaintiffs' claims that BroMenn breached the standard of care by allowing Lange to perform the procedures at issue in this case.  Accordingly, the trial court properly granted summary

- 30 -

judgment for BroMenn as to those claims.

¶ 72                            3. *Lack of Informed Consent*

¶ 73        Plaintiffs alleged in their complaint that BroMenn committed institutional negligence by (1) "permitting Dr. Lange to perform [EHL] upon [Kathryn], utilizing equipment provided by [BroMenn], when *** [Kathryn] had not given informed consent to such treatment"; (2) "failing to follow and enforce its own policies and procedures with respect to obtaining informed consent"; and (3) "failing to afford [Kathryn] her rights, under the Medical Patient Rights Act."

¶ 74        We note that plaintiffs also claimed BroMenn failed to (1) "follow and enforce the accreditation standards of the Joint Commission with respect to obtaining informed consent" and (2) "afford [Kathryn] her rights under the Patient Self-Determination Act of 1990."  However, plaintiffs' brief is completely devoid of any discussion, citations, or argument relating to the Joint Commission or the Patient Self-Determination Act.  Accordingly, plaintiffs have forfeited these claims by failing to argue them.  Ill. S. Ct. R. 341(h)(7) (eff. Feb. 6, 2013).

¶ 75        In support of their three remaining informed-consent claims, plaintiffs essentially present the same two-part argument: (1) because the informed-consent documents that Kathryn signed did not *specifically* mention EHL, Kathryn did not consent to Lange's use of EHL; and (2) because BroMenn's policy required physicians to obtain informed consent from patients, BroMenn committed institutional negligence by failing to ensure that Lange obtained informed consent from Kathryn.  The record provides no support for these claims.

¶ 76        Again in their brief to this court, plaintiffs rely primarily upon Copeland's section 2-622 report in support of their informed-consent claims.  Specifically, plaintiffs cite Copeland's

conclusory opinion that "BroMenn deviated from the medical standard of care by allowing [Kathryn] to undergo a surgical procedure without first obtaining [her] informed consent." However, Copeland did not state this opinion in his deposition, nor does such an opinion—or any evidence supporting such an opinion—appear elsewhere in the record.

¶ 77 The document that Kathryn signed prior to her April 8, 2008, procedure—entitled, "Acknowledgement of Informed Consent to Operation or Procedure"—included the following paragraph:

"3. I am aware that during the course of the authorized procedure, unexpected conditions may be revealed that require an extension of the authorized procedure or performance of a procedure different than stated in paragraph #1. I, therefore, authorize the above named physician and selected assistant(s) to perform such surgical and/or medical procedures as necessary in his/her professional judgment. I am aware that the practice of medicine and surgery is not an exact science, and I acknowledge that no guarantees have been made to me as to the results of the operation or procedure(s)."

¶ 78 Although plaintiffs rely heavily upon Copeland's purported "expert" opinion that Kathryn's agreement to the above paragraph does not demonstrate her agreement to the use of EHL, it does not take an expert to understand that the above paragraph authorized Lange, if he deemed it necessary in his professional judgment, to perform a procedure *not* specifically listed in the consent form. After all, it should not take a medical expert to interpret a document that is

- 32 -

intended to be read and understood by a patient. During summary judgment proceedings and on appeal in this case, plaintiffs have essentially ignored the consent form and offered no evidence (other than the inadmissible, conclusory opinions in Copeland's section 2-622 report) to suggest that "performance of a procedure different than stated in paragraph #1" did not encompass Lange's use of EHL to fragment the stone after it became stuck. Plaintiffs also ignore—and by that we mean they simply do not address—the following testimony from Copeland's deposition:

"[COPELAND]: *** I am fully cognizant of the fact that [informed consent] doesn't cover every single thing that you might do. And certainly when you're in the operating room a circumstance may arise that may include your desire or necessity to do something that was not on the sheet. And Dr. Lange talked about that, and I agree with that within the proper standard of care.

[COUNSEL]: So if you run into certain complications and, you know, there's a way to maybe help you get around those complications or problems, it may be permissible to go ahead and do some additional procedure even if you haven't talked with your patient about it ahead of time; is that fair to say?

[COPELAND]: Yes."

¶ 79          Plaintiffs further cite BroMenn's written policy regarding informed consent, which requires physicians to document, before a procedure, the "complete name of the procedure" and the "complete name of possible additional procedures." However, even assuming *arguendo* that Lange violated this policy by failing to document EHL as a possible

- 33 -

procedure, plaintiffs have entirely failed to establish any nexus between Lange's alleged violation of the policy and BroMenn's institutional duty of care to Kathryn.  Plaintiffs cite the following "hospital responsibilities" set forth in the policy:

> "1.  Maintain evidence of informed consent.
>
> 2.  The hospital may obtain verification of the patient's informed consent through use of the consent form when necessary.
>
> 3.  Verify that consent has been given voluntarily.
>
> 4.  Report questions of patient competency to the physician.
>
> 5.  Verify that the physician/patient communication took place.
>
> 6.  Provide a witness to the identity of the consent giver."

Although plaintiffs have cited these policy provisions in their brief, they have not identified which of these provisions (if any) BroMenn violated in this case.  Assuming *arguendo* that Lange's use of EHL was contrary to the informed consent Kathryn provided before the procedure, plaintiffs have not even attempted to explain how BroMenn fits into the picture.  Should BroMenn have somehow known ahead of time that Lange would deviate from the informed consent and perform an unauthorized procedure?  Plaintiffs have not only failed to provide evidence that BroMenn's acts or omissions regarding informed consent amounted to institutional negligence, they have not even presented a theory of liability.  As with most of the claims against BroMenn at issue in this case, plaintiffs have essentially interpreted the tort of institutional negligence as placing a strict-liability burden upon BroMenn to ensure that none of the physicians practicing on its premises deviate from the medical standard of care.  Because the

law does not place such a burden on hospitals, the trial court properly granted summary judgment to BroMenn regarding plaintiffs' informed-consent claims.

¶ 80                    4. *Failure To Make Available a Holmium Laser*

¶ 81           Finally, plaintiffs alleged that BroMenn committed institutional negligence by (1) "failing to provide necessary and standard equipment to Dr. Lange, including a Holmium laser," and (2) "permitting Dr. Lange to proceed with surgery upon [Kathryn] when Dr. Lange knew that a *** Holmium laser was not available."

¶ 82           In their brief to this court, plaintiffs' entire argument regarding these claims consists of the following single paragraph (which is word-for-word identical to the argument in plaintiffs' response to BroMenn's motion for summary judgment):

              "[BroMenn] protested that a Holmium laser could have

              been available if Dr. Lange had requested the device in advance of

              the procedure.  [Citation to BroMenn's summary judgment

              memorandum.]  But again, [BroMenn's] protestations do not

              support summary judgment.  Essentially, [BroMenn] pointed its

              finger at Dr. Lange, implying it was his fault (Dr. Lange), and not

              their fault that a Holmium laser was not available.  That question,

              of course, was for the jury to figure out.  BroMenn cannot escape

              liability by pointing its finger at Dr. Lange where Dr. Copeland has

              opined that it was a breach of the standard of care for BroMenn not

              to have available a Holmium laser when this non-emergent

              surgical procedure was permitted to take place in the BroMenn

- 35 -

facility. [Citation to Copeland's section 2-622 report.] [BroMenn] went to great lengths in its memorandum to argue that BroMenn had no obligation to have the equipment available absent a physician request. But again, this was an issue for the jury to decide."

¶ 83    In support of its motion for summary judgment in this case, BroMenn offered Cone's opinion that the applicable standard of care did not require BroMenn to own and make readily available a holmium laser. Instead, hospitals typically avoid the expense of purchasing such specialized equipment by using third-party providers to supply the equipment on a case-by-case basis. Instead of offering evidence to rebut Cone's opinion that BroMenn did not breach the standard of care, plaintiffs essentially rested on their pleadings and argued that the issue was for the jury to decide. However, "[i]f the party moving for summary judgment supplies facts that, if not contradicted, would warrant judgment in its favor as a matter of law, the opposing party cannot rest on its pleadings to create a genuine issue of material fact." *Abrams v. City of Chicago*, 211 Ill. 2d 251, 257, 811 N.E.2d 670, 674 (2004). Here, plaintiffs provided no evidence that the applicable institutional standard of care required BroMenn to determine, *in advance of and independent from Lange's determination*, all the pieces of specialized equipment that might be necessary during the April 8, 2008, procedure, including equipment—such as a holmium laser—that would be useful only if an unexpected complication arose. In other words, plaintiffs have failed to provide a factual basis for their institutional-negligence claims against BroMenn relating to the availability of a holmium laser. Accordingly, the trial court properly granted summary judgment to BroMenn.

¶ 84          Because plaintiffs failed to establish any evidentiary basis for their claims of institutional negligence against BroMenn, the trial court properly granted BroMenn's motion for summary judgment.  Having so concluded, we need not address the trial court's additional finding that plaintiffs failed to establish the element of proximate cause.

¶ 85                              III.  EPILOGUE

¶ 86          As a final matter, we note that the trial court in this case would have been better served had the attorneys on both sides appropriately addressed and resolved the glaring evidentiary deficiencies present during summary judgment proceedings.  As we have extensively discussed throughout this opinion, plaintiffs' fundamental contention—namely, that summary judgment is not appropriate because genuine issues of material fact exist—has been based mostly upon evidence that was inadmissible for purposes of summary judgment.  In response to plaintiffs' reliance upon improper evidence, BroMenn should have moved to strike the improper evidence for purposes of summary judgment.  Had BroMenn done so, the record on appeal would have reflected (much to this court's benefit) which specific pieces of evidence the court either relied upon or chose to disregard for purposes of its summary judgment ruling.  But because the court was not presented with such a motion, we are left to review the court's judgment without the benefit of knowing the exact evidence upon which the court based that judgment.  Thus, our resolution of this case required striking a balance between two considerations, both of which are important to the sound administration of justice.

¶ 87          On the one hand, an important component of our adversarial system is the general understanding that the trial court will give evidence that has been presented without objection its full probative effect.  " 'No duty rests upon the court to rule out evidence to which there might be

some objection; making appropriate objections is the function of the party opposing its admission.' " *People v. Parcel of Property Commonly Known as 1945 North 31st Street, Decatur, Macon County, Illinois*, 217 Ill. 2d 481, 503, 841 N.E.2d 928, 941 (2005) (quoting *Hill v. Meister*, 133 Ill. App. 2d 678, 682, 273 N.E.2d 643, 646 (1971)). This principle allows parties and courts of review to consider the legal issues without speculating as to the evidentiary basis of the judgment under review.

¶ 88        On the other hand, we also recognize that summary judgment proceedings serve a fundamentally different purpose than evidentiary hearings. Summary judgment does not call upon the trial court to weigh evidence and determine who wins a case, but instead, to determine whether the case should go to trial at all. *Pielet v. Pielet*, 2012 IL 112064, ¶ 53, 978 N.E.2d 1000 ("[T]he purpose of summary judgment is not to try questions of fact but simply to determine if triable questions of fact exist."). In making the summary judgment determination, the court is to consider the pleadings, depositions, admissions on file, and the affidavits. 735 ILCS 5/2-1005(c) (West 2012). The rules of form and substance that govern pleadings, depositions, admissions, and affidavits in the summary judgment context (for example, Rule 191(a)) help to ensure that the facts and opinions presented to the court will be admissible at trial, thereby allowing the court to determine whether a trial is actually warranted. In *Allen v. Meyer*, 14 Ill. 2d 284, 292, 152 N.E.2d 576, 580 (1958), the supreme court explained that the summary judgment determination affects more than the interests of the parties before the court:

> "Summary judgment procedure is an important tool in the
> administration of justice. Its use in a proper case, wherein is
> presented no genuine issue as to any material fact, is to be

encouraged.  The benefits of summary judgment in a proper case

inure not only to the litigants, in the saving of time and expenses,

but to the community in avoiding congestion of trial calendars and

the expenses of unnecessary trials."

¶ 89       Given the purpose of summary judgment, a party's failure to object when the other party cites clearly inadmissible facts or opinions does not mean that the trial court must accept those facts or opinions and set the case for trial if they create issues of material fact.  It would be a disservice to both the parties and the judicial system as a whole if the court were to base its summary judgment ruling on inadmissible evidence.  Although the better practice is for the opposing party to raise the appropriate objection, either through a motion to strike or otherwise, courts should not be expected to undertake the time and expense of a trial merely because of one party's failure to act as a meaningful adversary when summary judgment is at issue.  However, when the court does choose to disregard certain facts or opinions in the absence of an objection and ruling thereon, the court should make a record of its doing so—either orally or in a written order—so that a reviewing court will know the evidentiary basis upon which the court entered summary judgment.

¶ 90       Likewise, the parties would be better suited in summary judgment proceedings— and on appeal from summary judgment rulings—by explicitly listing in their summary judgment pleadings the specific facts and evidentiary materials upon which they are relying.  In *Simmons v. Reichardt*, 406 Ill. App. 3d 317, 323, 943 N.E.2d 752, 757 (2010), this court suggested that counsel should adopt a checklist, similar to the rules that attorneys must follow in summary judgment proceedings held in federal court, to minimize or eliminate deficiencies in summary

judgment pleadings. For instance, local rule 7.1(D)(1)(b) of the United States District Court, Central District of Illinois, requires a party filing a motion for summary judgment to include a section setting forth the undisputed material facts, as follows: "List and number each undisputed material fact which is the basis for the motion for summary judgment. Include as exhibits to the motion all relevant documentary evidence. For each fact asserted, provide citations to the documentary evidence that supports it, appropriately referencing the exhibit and page." C.D. Ill. Ct. R. 7.1(D)(1)(b) (eff. Jan. 20, 2010). The rules also require a response to a motion for summary judgment to list, among other things, the (1) undisputed material facts and (2) disputed material facts, which "must be supported by evidentiary documentation referenced by specific page." C.D. Ill. Ct. R. 7.1(D)(2)(b)(2) (eff. Jan. 20, 2010). Following such procedures in Illinois courts, although not mandatory, would help ensure that the trial court and courts of review do not overlook evidentiary materials that a party has deemed relevant to the summary judgment determination.

¶ 91            In *Evans*, 399 Ill. App. 3d at 251, 925 N.E.2d at 1277, this court explained the proper procedure to be used when a party seeks to bar the trial court from considering certain evidence for purposes of summary judgment. We began by noting that "asking the trial court not to consider certain evidence when it resolves a motion for summary judgment must be based upon more than mere musings *** at the time the motion is heard." *Id*. Instead, if a party intends to preclude the court's consideration of certain evidence for purposes of summary judgment, the party should file an appropriate motion to that effect in advance of the hearing so that both the court and the opposing party will be put on notice of that position. *Id*. The procedure proceeds, as follows:

"Then, the better practice would be for the matter to be litigated in a separate, formal hearing prior to the summary-judgment hearing itself. Alternatively, if the court believes the evidentiary matter at issue is not complicated, then the court in its discretion may address that matter immediately prior to the summary-judgment hearing or during that hearing itself, provided, of course, that the opposing party has received sufficient notice of the motion. Further, the moving party should seek—and the trial court should provide—a definitive ruling on the evidentiary matter at issue. Following this procedure would not only make for a better record at the trial level, it would also provide courts of review with a clear picture of (1) the parties' positions at trial and (2) the trial court's ruling.

If the evidentiary matter at issue is more involved, then the party seeking to bar the trial court's consideration of the evidence should make a motion to strike or bar the evidence and set the matter for a hearing prior to the hearing on the motion for summary judgment. This would be the preferred course, for instance, if a party wished to challenge expert testimony proffered by the other side in a summary-judgment context." *Id.* at 251-52, 925 N.E.2d at 1277.

¶ 92     In this case, for example, under the procedure laid out in *Evans*, BroMenn should

have moved to strike Copeland's section 2-622 report and plaintiffs' references thereto for purposes of the court's summary judgment determination. Although a motion to strike a section 2-622 report for purposes of summary judgment should not be necessary in most cases, plaintiffs' unambiguous reliance upon the report during summary judgment proceedings should have raised red flags for BroMenn, signaling that the court was being asked to deny BroMenn's motion based upon improper evidence. Despite the court's ultimately ruling in BroMenn's favor, BroMenn's failure to object to the improper evidence left the record silent as to whether the court actually considered or disregarded Copeland's inadmissible opinions. If the court in this case did disregard Copeland's section 2-622 report for purposes of summary judgment, some such indication in the record would have been useful for our review.

¶ 93       To be clear, the principles of forfeiture can apply in the summary judgment context, and parties are generally bound by their failure to object to improper evidence. See, *e.g.*, *Arnett v. Snyder*, 331 Ill. App. 3d 518, 523, 769 N.E.2d 943, 947 (2001) ("[T]he general rule is the sufficiency of affidavits cannot be tested for the first time on appeal where no objection was made by a motion to strike, or otherwise, in the trial court."). Nonetheless, under our *de novo* review of the trial court's judgment in this case, we have chosen to adhere to the command of section 2-1005(c) of the Code and chosen not to consider facts or opinions that do not come from the pleadings, depositions, admissions on file, or affidavits. It was plaintiffs' heavy reliance upon improper facts and opinions, coupled with BroMenn's failure to object, which merited our additional commentary regarding the better practice in summary judgment proceedings.

¶ 94                          IV.  CONCLUSION

¶ 95       For the reasons stated, we affirm the trial court's judgment.

- 42 -

¶ 96       Affirmed.

¶ 97       JUSTICE TURNER, specially concurring.

¶ 98       I agree the trial court's judgment should be affirmed for the reasons adequately and correctly expressed by the majority's discussion and analysis in paragraphs 58 to 84. However, I find the majority's discussion in paragraphs 40 to 57 and its "Epilogue" advisory in nature and, thus, a questionable undertaking for an intermediate court of review. While I do agree Copeland's section 2-622 report did not qualify as an affidavit under Rule 191(a), this issue was not presented for our review. Instead of moving to strike the report on that basis, BroMenn's counsel successfully opted to discredit Copeland by demonstrating his sworn testimony in his deposition did not support the opinions he expressed in his section 2-622 report. That conclusion is essentially the one the majority ultimately reaches in paragraphs 58 to 84, and I see no reason to critique or second-guess counsel's winning strategy.